ACCEPTED
15-25-00051-cv
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
11/6/2025 12:31 PM
CHRISTOPHER A. PRINE
CLERK

NO. 15-25-00051-CV

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
11/6/2025 12:31:52 PM
CHRISTOPHER A. PRINE
Clerk

**In the Court of Appeals 15th Judicial District of Texas
at Austin, Texas
Originating out of the Fifth Court of Appeals for the State of Texas
at Dallas, Texas**

**MARIBEL L. HILL,
Appellant**

**vs.**

**DWIGHT L. HILL,
Appellee**

On Appeal from the
302nd Judicial District Court, Dallas County, Texas
Cause No. DF-22-14398
(Hon. Sandra Jackson, Judge Presiding)

**DWIGHT L. HILL APPELLEE'S BRIEF**

**ORSINGER, NELSON, DOWNING &
ANDERSON, LLP**
425 Soledad, Suite 550
San Antonio, Texas 78205
Telephone: (210) 225-5567

Richard R. Orsinger
State Bar No. 15322500
richard@ondafamilylaw.com

**EPSTEIN FAMILY LAW, P.C.**
5949 Sherry Lane, Suite 1070
Dallas, Texas 75225
Telephone: (972) 232-7673

Robert Epstein
State Bar No. 24065206
robert@epsteinpc.com

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Record references used in this Brief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

Abbreviations Used in this Brief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

RESPONSES TO APPELLANT'S ISSUES PRESENTED . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Response to Appellant's First Issue Presented

        The property division is supported by the evidence and Maribel has not
        shown that the Trial Court abused its discretion. . . . . . . . . . . . . . . . . . . . . . 6

    Trial Court's Discretion; Standard of Appellate Review . . . . . . . . . . . . . . . . . 6
    Sufficiency of the evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Presumptions in support of the judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    The property division in this case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    This issue is really a valuation question . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Dwight's Insurance Agency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    The LLC is an agent of State Farm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    The Records belong to State Farm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Policy-holder information belongs to State Farm. . . . . . . . . . . . . . . . . . . . . 13
    All cash belongs to State Farm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    Return of property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    Solicitation of clients prohibited for one year . . . . . . . . . . . . . . . . . . . . . . . 14
    No assignment without State Farm's consent. . . . . . . . . . . . . . . . . . . . . . . . 15
    Post-divorce labor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    Personal goodwill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Non-compete. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Factors to consider. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Nature of the marital property. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Relative earning capacity and business opportunities . . . . . . . . . . . . . . . . . . 21
Relative financial condition and obligations . . . . . . . . . . . . . . . . . . . . . . . . . 23
The parties' education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
The size of the separate estates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Age, health, and physical conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Fault in breaking up the marriage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Benefits which the party not at fault would have received had the marriage
    continued . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
The probable need for future support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Dwight's separate estate benefitted the community and Maribel's separate estates
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Cannot render a different property division . . . . . . . . . . . . . . . . . . . . . . . . . 26

Response to Maribel's Second Issue Presented

    The Trial Court did not abuse its discretion in determining the present
    value of Dwight's extended termination payments. There was sufficient
    evidence to support this decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Response to Maribel's Third Issue Presented

    The Trial Court did not abuse its discretion in denying Maribel's request
    for post-divorce spousal maintenance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

The Standard of Appellate Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Minimum Reasonable Needs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
Presumption against maintenance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Relevant Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
Support is considered in the property division . . . . . . . . . . . . . . . . . . . . . . . 34

Response to Maribel's Fourth Issue Presented

    The absence of Findings of Fact and Conclusions of Law does not
    require further action by this Court because the appellate record is
    sufficient to review Appellant's complaints . . . . . . . . . . . . . . . . . . . . . . . 35

PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

APPENDIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## INDEX OF AUTHORITIES

<u>Cases</u>

*Ad Villarai v. Chan Il Pak*, 519 S.W.3d 132 (Tex. 2017) . . . . . . . . . . . . . . . . . . 36

*Banakar v. Krause*, 674 S.W.3d 564 (Tex. App.--Houston [1st Dist.] 2023, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Bell v. Bell*, 513 S.W.2d 20 (Tex. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 9

*Berry v. Berry*, 647 S.W.2d 945 (Tex. 1983). . . . . . . . . . . . . . . . . . 3, 17, 27, 28

*Butnaru v. Ford Motor Co.*, 84 S.W.3d 198 (Tex. 2002) . . . . . . . . . . . . . . . . . . 7

*Carlin v. Carlin*, 92 S.W.3d 902 (Tex. App.--Beaumont 2002, no pet.). . . . . . . . 33

*Ceniseros v. Rychlik*, No. 03-17-00532-CV (Tex. App.—Austin Sept. 7, 2018, no pet.) (mem. op.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Dillon v. Anderson*, 358 S.W.2d 694 (Tex. Civ. App.--Dallas 1962, writ ref'd n.r.e.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Harwood v. Harwood*, No. 03-23-00455-CV (Tex. App.–Austin Aug. 6, 2025, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Horlock v. Horlock*, 533 S.W.2d 52 (Tex. Civ. App.-- Houston [14th Dist.] 1975, writ dism'd) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Howe v. Howe*, 551 S.W.3d 236 (Tex. App.--El Paso 2018, no pet.) . . . . . . . . . 36

*In re J.Y.O.*, 709 S.W.3d 485 (Tex. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Marriage of C.A.S. & D.P.S.*, 405 S.W.3d 373 (Tex. App.--Dallas 2013, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 19

*In re Marriage of Day*, 497 S.W.3d 87 (Tex. App.--Houston [14th Dist.] 2016, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*In the Interest of L.C.W.*, No. 05-23-00815-CV (Tex. App.--March 14, 2025, pet. denied) (mem. op.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 19

*In the Matter of Marriage of Santopadre*, No. 05-07-00027-CV (Tex. App.--Dallas August 19, 2008, no pet.) (memo. op.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In the Matter of Marriage of Williams and Williams*, No. 06-18-00041-CV (Tex. App.--Texarkana Dec. 7, 2018, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*In the Matter of the Marriage of Combs*, 958 S.W.2d 848 (Tex. App.--Amarillo 1997, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Jacobs v. Jacobs*, 687 S.W.2d 731 (Tex. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*LaFrensen v. LaFrensen*, 106 S.W.3d 876 (Tex. App.--Dallas 2003, no pet.) . 7, 19

*Las Vegas Pecan & Cattle Co., Inc. v. Zavala County*, 682 S.W.2d 254 (Tex. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Mehta v. Mehta*, 716 S.W.3d 126 (Tex. 2025) . . . . . . . . . . . . . . . . 4-5,30-32, 34, 36

*Moroch v. Collins*, 174 S.W.3d 849 (Tex. App.--Dallas 2005, pet. denied) . . . . . . 9

*Munai v. Munai*, No. 05-12-01409-CV (Tex. App.--Dallas Feb. 20, 2015, no pet.) (mem. op.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Murff v. Murff*, 615 S.W.2d 696 (Tex. 1981) . . . . . . . . . . . . . . . . . . . . . . 6, 19, 26

*Nail v. Nail*, 486 S.W.2d 761 (Tex. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*O'Carolan v. Hopper*, 71 S.W.3d 529 (Tex. App.–Austin 2002, no pet.) . . . . . . 31

*Rathmell v. Morrison*, 732 S.W.2d 6 (Tex. App.--Houston [14th Dist.] 1987, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Reisler v. Reisler*, 439 S.W.3d 615 (Tex. App.--Dallas 2014, no pet.) . . . . . . . . . 7

*Slicker v. Slicker*, 464 S.W.3d 850 (Tex. App.--Dallas 2015, no pet.) . . . . 8, 19, 32

*Smith v. Smith*, 620 S.W.2d 619 (Tex. Civ. App.—Dallas 1981, no writ) . . 7, 9, 24

*Tenery v. Tenery*, 932 S.W.2d 29 (Tex. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Ulmer v. Ulmer*, 717 S.W.2d 665 (Tex. App.--Texarkana 1986, no writ) . . . . . . 29

Statutes

Tex. Fam. Code § 3.002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Tex. Fam. Code § 7.001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Tex. Fam. Code § 8.001(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Tex. Fam. Code § 8.051 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Tex. Fam. Code § 8.051(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Tex. Fam. Code § 8.052 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 36

Tex. Fam. Code § 8.053(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Tex. Fam. Code § 8.055 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Tex. Fam. Code § 8.055(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## Record references used in this Brief

Clerk's Record                                       CR[pg.#]

Supplemental Clerk's Record                          Supp.CR[pg.#]

Reporter's Record                                    [Vol.]RR[pg.#]

Petitioner's Exhibits                                P-[#]

Respondent's Exhibits                                W-[#]

## Abbreviations Used in this Brief

| | |
|---|---|
| Maribel Hill | Wife, W, Appellant |
| Dwight Hill | Husband, H, Appellee |
| Wife's Sworn Inventory and Appraisement | W's I&A; Px2 at 2RR212-33 |
| Husband's Sworn Inventory and Appraisement | H's I&A; Px3 at 2RR234-52 |
| Decree of Divorce | Decree, CR84-113 |

**RESPONSES TO APPELLANT'S ISSUES PRESENTED**

**Response to Appellant's First Issue Presented**

The property division is supported by the evidence and Maribel has not shown that the Trial Court abused its discretion.

**Response to Appellant's Second Issue Presented**

The Trial Court did not abuse its discretion in dividing Dwight's extended termination payments. There was sufficient evidence to support this decision.

**Response to Appellant's Third Issue Presented**

The Trial Court did not abuse its discretion in denying Appellant's request for post-divorce spousal maintenance.

**Response to Appellant's Fourth Issue Presented**

The absence of Findings of Fact and Conclusions of Law does not require an abatement of the appeal because the appellate record is sufficient to review Appellant's complaints.

**STATEMENT OF FACTS**

Much of the property was divided by agreement of the parties. The primary contested issues at trial were the value of Dwight's insurance agency; the characterization and division of Dwight's extended termination payments from State Farm; and whether Maribel would receive post-divorce maintenance payments.

The parties married on October 19, 2001. [2RR28] Dwight filed for divorce on September 27, 2022. *Id.* The case went to trial on June 17, 2024. [2RR1] Judgment was rendered on June 20, 2024. [3RR85-ff.] Other relevant information is discussed

1

under the responses to issues presented by Maribel.

## SUMMARY OF THE ARGUMENT

First Issue: Value of the Insurance Agency. Trial courts have wide discretion in dividing the community estate upon divorce. An appellate court can only reverse if the trial court abused its discretion. Legal and factual sufficiency of the evidence are included within the abuse of discretion review. There can be no abuse of discretion if the property division is supported by some evidence. The Supreme Court has said that the appellate court presumes that the trial court exercised its discretion properly. A court of appeals cannot overrule the trial court's decision except where the trial court acted unreasonably or in an arbitrary manner, without reference to guiding rules or principles. An appellate court cannot substitute its judgment for the trial court's reasonable judgment even if it would have reached a contrary conclusion. The Dallas Court of Appeals has applied these standards in many cases, some of which are cited in this Brief. Appellant has not shown that the Trial Court abused its discretion in the property division. Also, Appellant requests that this Court modify the property division to award her a substantial sum of money. This Court cannot do that. If the property division were to be reversed, the only remedy would be to remand the case to the trial court for a new division.

Second Issue: Actuarial Discount of Deferred Compensation. There are no fact issues regarding the extended termination payments. They are a form of deferred

2

compensation. The exact number of months of total employment and the number of months of employment during marriage are known. From these two numbers, by following the rulings of the Texas Supreme Court, a fraction can be calculated to determine the community property interest in the payments. When a spouse continues employment after divorce, *Berry v. Berry*, 647 S.W.2d 945 (Tex. 1983), requires the court to cut off the accrual of benefits to the community estate by imagining retirement on the date of divorce. In this case, if Husband were to elect to start receiving his extended termination payments as of the date of divorce, it would be premature and under the rules in place the benefits must be actuarially adjusted downward because of the early start date. State Farm has done the calculation of the actuarial adjustment, permitting the Trial Court to make the *Berry* adjustment with complete accuracy. One final factor is involved: under the controlling Agent's Agreement the future deferred payments are based on earnings during the 12 months before termination, or the 12 months after termination, of employment whichever is less. Because of this, the actual payment could be lower on the date of termination than on the date of divorce. If the Trial Court gave a fixed percentage of the retirement payments and it turns out that the actual payments are less than divorce-time calculation, it would lead to a taking of Husband's separate property in violation of *Berry*. To comply with *Berry*, the Trial Court awarded Wife half of the community percentage applied to the divorce-time payment, or half of the community percentage

3

of the actual payment Husband receives upon termination, whichever is less.

Third Issue: Post-Divorce Spousal Maintenance. Wife requested post-divorce spousal maintenance payments. In June of this year, the Supreme Court decided *Mehta v. Mehta*, 716 S.W.3d 126 (Tex. 2025), the appeal of an award of spousal maintenance. The Court applied an abuse-of-discretion standard, and a legal-sufficiency-of-the-evidence (i.e., more than a scintilla) test in affirming the trial court's ruling. Post-divorce maintenance is not available unless the spouse cannot pay his/her minimum reasonable needs out of employment or his/her share of the property division. Here Wife was awarded more than a million dollars of wealth in the property division. Her justification for wanting spousal maintenance is largely attributable to her desire to not wanting to sell the investment real estate she was awarded. The Family Code requires a showing that a spouse seeking maintenance exercised diligence in: (1) earning sufficient income; or (2) developing the necessary skills to provide for those needs during a period of separation and during the time the suit for the dissolution of the marriage is pending. Wife is a licensed real estate broker with more than 32 years of experience with investment real estate. In this case, Wife has had 21 months of the pending divorce to find employment and she has failed to do so.

Fourth Issue: The failure of a trial court to issue findings of fact and conclusions of law does not require remedial action if the record demonstrates that the

4

complaining party suffered no harm. In this case, most of the property division was agreed upon. Both parties introduced spreadsheets reflecting their positions on all of the properties. At the conclusion of the trial, the Trial Court meticulously ruled on each issue raised by the parties. At a post-rendition hearing on motion to enter judgment, the attorneys had the opportunity to advocate or object to each part of the Divorce Decree. Wife's First Issue Presented is a sufficiency-of-the-evidence challenge regarding the value of Husband's insurance agency. Her contention is that the agency is worth $728,000. From that she contends that the property division disproportionately favored husband. That contention is evaluated on appeal by reviewing the evidence. Appellant's Second Issue Presented is that the Court should not have applied an actuarial discount to extended termination payments. In the hearing on Motion to Enter Judgment the Court said: "We're going to follow what State Farm has said in the actuarial table." [5RR8] It is now a question for this Court whether the evidence supporting this decision negates Appellant's abuse of discretion challenge. Appellant's Third Issue Presented is the denial of post-divorce spousal maintenance. This reduces to an assessment of whether the Trial Court's decision is supported by legally-sufficient evidence. In the *Mehta* case, there were no findings of fact but the Supreme Court nonetheless reviewed the legal sufficiency of the evidence to support the trial court's decision as part of its abuse-of-discretion analysis. The remedy for a lack of findings and conclusions is not reversal and

5

remand, but is instead to abate the case and remand to the trial court to forward findings and conclusions. In this case, that would not accomplish anything. The issues in this appeal are narrow and the appellate record is amply sufficient for this Court to conduct its appellate review.

## ARGUMENT AND AUTHORITIES

### Response to Appellant's First Issue Presented

The property division is supported by the evidence and Maribel has not shown that the Trial Court abused its discretion.

<u>Trial Court's Discretion; Standard of Appellate Review.</u> In a divorce, "the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." Tex. Fam. Code Ann. § 7.001. "It is well-established that Texas divorce courts are given wide discretion in making division of the property of the parties. That discretion will not be disturbed on appeal unless the court has clearly abused its discretion." *Bell v. Bell*, 513 S.W.2d 20, 22 (Tex. 1974); *accord*, *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981) ("[t]he trial court has wide discretion in dividing the estate of the parties and that division should be corrected on appeal only when an abuse of discretion has been shown"). "Texas courts have held that such division does not have to be equal, and appellate courts have held it must be presumed that the trial court exercised its discretion properly, and that a case should be reversed only where

there is a clear abuse of discretion." *Bell*, *supra* at 22. "[U]nder an abuse of discretion standard, the court of appeals cannot overrule the trial court's decision unless the trial court acted unreasonably or in an arbitrary manner, without reference to guiding rules or principles." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002). "Moreover, the court of appeals cannot substitute its judgment for the trial court's reasonable judgment even if it would have reached a contrary conclusion." *Id.* "The trial court does not abuse its discretion if some evidence reasonably supports the trial court's decision." *Id.*

This Court has recognized these standards in earlier divorce cases: *Smith v. Smith*, 620 S.W.2d 619, 623 (Tex. Civ. App.—Dallas 1981, no writ) ("the trial court is not required to make an equal division of community assets, but has a wide discretion which will be disturbed only when abuse of discretion is shown. ... In exercising its discretion, the court may consider all the circumstances of the parties."); *LaFrensen v. LaFrensen*, 106 S.W.3d 876, 877 (Tex. App.--Dallas 2003, no pet.) ("A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision"); *In re Marriage of C.A.S. & D.P.S.*, 405 S.W.3d 373, 384 (Tex. App.--Dallas 2013, no pet.) ("The property division need not be equal, and a trial court may consider many factors when exercising its broad discretion to divide the marital property"); *Reisler v. Reisler*, 439 S.W.3d 615, 619 (Tex. App.--Dallas 2014, no pet.) ("The trial court is afforded broad

7

discretion in dividing the community estate, and an appellate court must indulge every reasonable presumption in favor of the trial court's proper exercise of its discretion"); *Munai v. Munai*, No. 05-12-01409-CV, 2015 WL 737037, at *2 (Tex. App.--Dallas Feb. 20, 2015, no pet.) (mem. op.) ("A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision"); *Slicker v. Slicker*, 464 S.W.3d 850, 858 (Tex. App.--Dallas 2015, no pet.) ("The party complaining of the division of the community estate has the burden of showing from the evidence in the record that the trial court's division of the community estate was so unjust and unfair as to constitute an abuse of discretion"); *In the Interest of L.C.W.*, No. 05-23-00815-CV, at *23 (Tex. App.--March 14, 2025, pet. denied) (mem. op.) ("We review the trial court's division of a community estate for an abuse of discretion. ... A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision."). "The trial court is best able to 'observe the demeanor and personalities of the witnesses and [to] 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *Ceniseros v. Rychlik*, No. 03-17-00532-CV, 2018 WL 4265679, at *3 (Tex. App.--Austin Sept. 7, 2018, no pet.) (mem. op.).

Sufficiency of the evidence. "In family law cases, the abuse of discretion standard of review overlaps with the traditional sufficiency standards of review; as a result,

8

legal and factual sufficiency are not independent grounds of reversible error, but instead constitute factors relevant to our assessment of whether the trial court abused its discretion." *Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex. App.--Dallas 2005, pet. denied). In *Smith v. Smith*, 620 S.W.2d 619, 623 (Tex. Civ. App.--Dallas 1981, no writ), this Court said: "In exercising its discretion, the court may consider all the circumstances of the parties." In *Banakar v. Krause*, 674 S.W.3d 564, 573-74 (Tex. App.--Houston [1st Dist.] 2023, no pet.), the Court said: "[i]n a bench trial, the trial court, as the fact finder, is the sole judge of the witnesses' credibility and the weight to be given their testimony. ... The trial court may choose to believe some witnesses over others. ... We are mindful that the trial [court] is best able to observe and assess the witnesses' demeanor and credibility, and to sense the forces, powers, and influences that may not be apparent from merely reading the record on appeal." (Citations and internal quotation marks omitted).

Presumptions in support of the judgment. In *Bell*, *supra* at 22, an appeal of a divorce property division, the Supreme Court said: "it must be presumed that the trial court exercised its discretion properly, and that a case should be reversed only where there is a clear abuse of discretion." In *In the Matter of Marriage of Santopadre*, No. 05-07-00027-CV (Tex. App.--Dallas August 19, 2008, no pet.) (memo. op.), this Court said: "We indulge every reasonable presumption in favor of the trial judge's proper exercise of discretion in dividing the community estate." *Accord*, *In the*

9

*Interest of L.C.W.*, *supra*, at \*23 ("an appellate court must indulge every reasonable presumption in favor of the trial court's proper exercise of its discretion").

The property division in this case. Much of the property division in this case was agreed to by the parties.

Agreed[1] Division:

1. Agreed that 1211 Ft Velasco was W's separate property and would be awarded to her; the value was not agreed: W's value=$265,000; appraisal district value=$307,370; H's value= $350,000.[2]
2. Agreed H to receive 123 Nesmith Place at the agreed value of $75,000.
3. Agreed to sell 107 Nesmith Pl; agreed value=$546,000; Court awarded 65% to Wife and 35% to Husband. [Decree, CR 85 & 88].
4. Agreed W to receive 118 Nesmith Place at an agreed value of $75,000.
5. Agreed H to receive cash on hand of $10,000.
6. Agreed H to receive PNC #6618 with $126.
7. Agreed H to receive PNC # 2065 with $2.
8. Agreed to split 50/50 State Farm FCU #2289, $102 to each party.
9. Agreed to split 50/50 PNC #4643, $4,616 to each party.
10. Agreed to give daughter Ava PNC #2033.
11. Agreed H to receive PNC Bank #2183 with $14,327.
12. Agreed to divide 50/50 State Farm Funds Brokerage # 608, $8,972 to each party.
13. Agreed to divide 50/50 JP Morgan Chase #2507 ($52,742 to each party).
14. Agreed W to receive JP Morgan Chase #2380 with $52,742 (from Chase #2507).
15. Agreed W to receive Restore Entertainment, LLC with $544.
16a. Agreed to divide 50/50 PNC #3338; W's I&A=omitted; H's I&A=$5,246.20.
16b. Agreed 2022 Toyota 4Runner (in W's possession) to be given to daughter Ava.
17. Agreed W to receive Grateful Hippies, LLC with $264 cash.

---

[1] Dwight's proposed property division is P-1, Ex. A, admitted at 2RR14 and found at 2RR204, App. 1. Maribel's proposed property division is Amended W-2, at 3RR133, App. 2. Dwight agreed to his exhibit at 2RR33. Maribel agreed to her exhibit at 3RR34.

[2] Maribel's value and the appraisal district value are in W's I&A, 2RR215; Dwight's value is in H's I&A, 2RR236).

27. Agreed H to receive Honda Scooter Elite valued at $600.
28. Agreed W to receive 2014 Club Car Gas xtr 850 valued at $5,000.
29. Agreed H to receive 2010 Lexus LX570 valued at $20,000.
30. Agreed W to receive 2021 Mazda CX-5, W's I&A=$24,000, H's I&A=$25,000.
31. Agreed 2022 Ford F-150 to be given to son Jacob.
32. Agreed H to receive clothes, bicycle, books, guitar, tools in his possession, $5,000.
33. Agreed household furnishings, musical instruments & tools go to H, $8,000.
34. Agreed computer monitors (x2) (to H) $100.
35. Glock 26 (to H) $500.
36. Sig P238 (to W) $600.
37. Agreed W to receive 4.53 ct Diamond/Platinum Ring; H valued at $75,000.[3]
38. Agreed W to receive diamond necklace; H valued at $15,000.[4]
39. Agreed Maribel Hill Music
40. Unknown jewelry

Division Not Agreed

16. Dwight Hill Insurance Agency, Inc. awarded to H.[5]
18. State Farm Fund Maribel Hill Roth IRA ending in 9212 awarded to W, $34,521.
19. State Farm Fund Dwight Hill Roth IRA ending in 9211 awarded to H, $34,471.
20. State Farm Pershing 4620 ROTH IRA $625,882 awarded, $312,941 to each party.
21. State Farm 9931 Roth IRA $157,490 awarded, $78,745 to each party.
22. Ascensus Trust IRA #2370, $64,963 awarded, $32,482 to each party.
23. Ascensus Trust IRA #2370, $49,752 awarded, $24,876 to each party.
24. State Farm Blackrock #C17dn, $109,964 awarded, $54,982 to each party.
25. State Farm Roth IRA #C9ASY, $143,926 awarded $71,963 to each party.
26. Termination payments: Court divided community interest 50/50, 31.63% to each.

This issue is really a valuation question. Maribel's claim that the Trial Court gave

Dwight a disproportionate division of the community estate is premised on her

---

[3] Dwight's value was $75,000, [2RR207, ¶37]; Maribel had no value [3RR135, ¶37].

[4] Dwight's value was $15,000 [2RR207, ¶38]; Maribel had not value [3RR135, ¶38].

[5] Dwight had zero value [2RR205, ¶16]; Maribel valued at > $728,000 [3RR134, ¶16].

11

assertion that the value of the community estate's interest in Dwight Hill's insurance agency was worth $728,000, "based on net income." [Appellant' Brief. at 9.] At one time Fuqua valued the agency between $100,000 and $150,000. [2RR186] That was back in 2022. [2RR190] In that valuation Fuqua did not consider the Agent's Agreement, or the fact that all furniture, equipment, software, client information, and insurance policies belonged to State Farm. He did an income approach that assumed ownership of all the assets. [2RR192] However, that calculation has no application to this agency. *Id*

Dwight's Insurance Agency. Dwight is an agent of the State Farm Insurance Company. [2RR30] He has an employment contract with State Farm and is paid a commission to service State Farm's clients. *Id.* Dwight started as a State Farm agent on August 1, 1988. *Id.* He was an agent for about 13 years before he married Maribel. *Id.* Dwight does business through Dwight Hill Insurance Agency, LLC. The agency has no employees other than Dwight himself. [2RR87] Dwight does not own the office furniture or equipment he uses in his business, he does not own the client information, he does not own the insurance policies. *Id.* The only assets of the business are about $3,000, a vehicle (which the parties agreed to give to their daughter), and some chairs. [2RR87-88] Dwight's forensic CPA Stephen Fuqua testified that the only asset the LLC could sell is the vehicle. [2RR155] The September 30, 2022 letter from State Farm regarding the Agent's Agreement between

12

Dwight Hill Insurance Agency, Inc. and State Farm [2RR1117-18], explained the ownership rights regarding Dwight's insurance agency:

The Dwight Hill Insurance Agency, Inc. has no proprietary interest in the business generated under the Agent's Agreement (AA04 INC) with State Farm Mutual Automobile Insurance Company, State Farm Life Insurance Company, State Farm Fire and Casualty Company and State Farm General Insurance Company (collectively referred to herein after as "State Farm"). The policies credited to the Dwight Hill Insurance Agency, Inc. account belong to State Farm and may be reassigned by State Farm to the accounts of other State Farm agents when the Agent's Agreement terminates. The policyholder records and the right to use those records to solicit renewals - commonly referred to as the "expirations" - belong to State Farm. Compensation or payments due or to become due under the Agreement may, however, be assigned with the written consent of the Companies and, of course, by operation of law.

Dwight's Agency Agreement with State Farm [2RR461, App. 5] sets out the terms of his agency relationship as follows:

The LLC is an agent of State Farm. On page 1 State Farm appoints Dwight Hill Insurance Agency, LLC as an agent to represent "the Companies" in Texas. *Id.*

The Records belong to State Farm. Section I, ¶C says that State Farm "will furnish the Agent, without charge, manuals, forms, records, and such other materials and supplies as the Companies may deem advisable to provide. All such property furnished by the Companies shall remain the property of the Companies." *Id.*

Policy-holder information belongs to State Farm. Paragraph D says that information regarding names, addresses, and ages of policyholders, description of property insured, etc. "are trade secrets wholly owned by the Companies." *Id.* "All

13

forms and other materials, whether furnished by State Farm or purchased by the Agent, upon which this information is recorded shall be the sole and exclusive property of the Companies." *Id.*

All cash belongs to State Farm. Paragraph I says: "All moneys collected on behalf of the Companies shall be held in trust by the Agent as the absolute property of the Companies, and the Agent will be responsible for these moneys until they are safely transmitted to the Companies." *Id.*

Termination. Section III, ¶A, gives either party the right to "terminate this Agreement by written notice delivered to the other or mailed to the other's last known address." No minimum notice is required. The date of termination is the date specified in the notice. Paragraph B says that "[a]fter termination of this Agreement, the Agent agrees not to act or represent itself in any way as an agent or representative of the Companies." [2RR463]

Return of property. Paragraph C says: "Within ten days after the termination of this Agreement, all property belonging to the Companies shall be returned or made available for return to the Companies or their authorized representative." *Id.*

Solicitation of clients prohibited for one year. Paragraph D says that "For a period of one year following termination of this Agreement, neither the Agent, the President, nor any of the licensed sales representatives, will either personally or through any other person, agency, or organization (a) induce or advise any State Farm

14

policyholder credited to the Agent's account at the date of termination to lapse, surrender, or cancel any State Farm insurance coverage or (b) solicit any such policyholder to purchase any insurance coverage competitive with the insurance coverages sold by the Companies. In the event the 'period of one year' conflicts with any statutory provision, such period shall be the period permitted by statute." *Id.*

No assignment without State Farm's consent. Section VI, ¶B, says: "Since each party is relying upon the other or others to carry out the provisions of this agreement, neither the agreement nor any interest thereunder can be sold, assigned, pledged, and no right in any sum due or to become due to the agent hereunder can be sold, assigned, or pledged without prior written consent of the companies." [2RR64 & 467, App. 5] Dwight has no right to assign any aspect of his business to anyone, except with State Farm's consent – an unknown future contingency. Dwight cannot sell or assign insurance policies. [2RR64 & 155]. He can't sell or assign client information. *Id.* He can't sell or assign any of the equipment. *Id.* Dwight testified: "My computer, my phone systems, any technology all belongs to State Farm. My printers, faxers, scanners, all of that is State Farm equipment. I have a lease agreement and a maintenance agreement with them. And I cannot store any State Farm data on any other device of any kind." [3RR65] The Agent's Work Station Loan Agreement [2RR513 App. 6], ¶1, is where Dwight borrows his office equipment: "STATE FARM agrees to loan to AGENT and AGENT agrees to borrow from

15

STATE FARM the items of equipment (collectively, the "Equipment") listed on Exhibit A attached hereto and incorporated herein. The parties agree that the Equipment becomes part of the ECHO system in AGENT's possession under the ECHO System Agreement." Paragraph 2 is where Dwight borrows the computer software: "STATE FARM agrees to loan to AGENT and AGENT agrees to borrow from STATE FARM the software (collectively, the 'Software') listed on Exhibit A attached hereto and incorporated herein." Paragraph 3 says that the equipment and software are loaned until terminated on 30-days' written notice, but the loan terminates immediately upon termination of the State Farm Agent's Agreement. Paragraph 6 prohibits Dwight from adding any equipment or software, or using State Farm's equipment to access the internet for anything except the State Farm home page. Paragraph 8 says: "STATE FARM leases, owns or licenses the Equipment and Software under this Agreement." [2R514] The Memorandum of Agreement re: Block Assignments [2RR532], says: "it may be of mutual benefit to the Companies and the Agent for policies to be assigned from time to time to the Agent for service." If State Farm assigns policies to Dwight to manage, his compensation is set in a Schedule of Payments Agreement. "Assigned" policies are policies credited to Dwight's account for less than ten years that were freed up by the termination of another agent, or by release by another agent, or that resulted from the merger between companies.

In sum, Dwight Hill Insurance Agency, LLC has no assets except a small amount

16

of cash on deposit and a vehicle which the parties agreed will be given to their daughter. Dwight has been appointed as an agent to handle clients whose contracts State Farm assigns to him, but in doing so he must use State Farm equipment and software, which cannot be used for any other purpose. Dwight's agency relationship with State Farm can be canceled at any time with no minimum notice. If canceled, Dwight cannot solicit any existing policy-holders for a period of one year or he forfeits his termination payments. The money Dwight receives from policyholders belongs to State Farm and he holds those funds in trust for State Farm until they are paid over to State Farm. There is no business to divide in the divorce. Fuqua testified that there is no ability to sell a revenue stream to a buyer. [3RR196]

Post-divorce labor. Contrary to Maribel's assertion, a divorce court cannot value the community estate's interest in a personal-service business based on post-divorce income because post-divorce income belongs to a person who is no longer married, and the community estate has no claim to post-divorce labors. Tex. Fam. Code § 3.002 ("Community property consists of the property, other than separate property, acquired by either spouse during marriage"); *Berry v. Berry*, 647 S.W.2d at 947 (post-divorce employee compensation is separate property and cannot be awarded to the other spouse); *In re J.Y.O.*, 709 S.W.3d 485, 491 (Tex. 2024) ("we hold that the characterization of a bonus—like any compensation—depends on when it was earned").

17

Personal goodwill. Additionally, the personal goodwill of the working spouse must be excluded from any division of the estate of the parties. *Nail v. Nail*, 486 S.W.2d 761 (Tex. 1972) ("the accrued good will ... of ... Dr. Nail ... did not possess value or constitute an asset separate and apart from his person, or from his individual ability to practice his profession. It would be extinguished in event of his death, or retirement, or disablement, as well as in event of the sale of his practice or the loss of his patients, whatever the cause."). *Accord*, *Rathmell v. Morrison*, 732 S.W.2d 6, 18 (Tex. App.--Houston [14th Dist.] 1987, no writ) (applying *Nail*'s description of personal goodwill to the owner of an insurance business). Dwight Hill's insurance agency had no employees, no assets except a few side-chairs, no client information, and its ability to service policy-holders is subject to termination with no minimum notice. The business had no value separate and apart from Dwight's person, and his individual ability to practice his profession. The value of the community estate's interest was limited to $5,247.20 cash in a bank account [P-3, 2RR239], and a vehicle which was awarded by agreement to the parties' daughter. [Decree, CR97 ¶b].

Non-compete. Dwight's Agency Agreement provides that the agency arrangement can be terminated at any time by either party upon delivery of notice of termination. [2RR63; 2RR463] There is no minimum notice period. After termination of his agency relationship with State Farm, Dwight cannot "act or represent itself in any way as an agent or representative of the companies." *Id.* For a period of one year after

18

termination, Dwight cannot "induce or advise any State Farm Policy credited to the agent's account at the time of termination to lapse, surrender, or cancel any State Farm Insurance coverage or (B) solicit any such policyholder to purchase any insurance coverage competitive with the insurance coverages sold by the companies." Id. If he violates these terms, Dwight forfeits his termination payments. [3RR62]

A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision. *LaFrensen v. LaFrensen*, *supra* at 877. "The party complaining of the division of the community estate has the burden of showing from the evidence in the record that the trial court's division of the community estate was so unjust and unfair as to constitute an abuse of discretion." *In re Marriage of C.A.S.*, *Supra* at 384; see also *Slicker v. Slicker*, *supra* at 858.

Factors to consider. In *In the Interest of L.C.W.*, *supra* at *8, this Court wrote:

> When exercising its broad discretion to divide the community estate, the trial court may consider many factors, including the nature of the marital property; the relative earning capacity and business opportunities of the parties; the parties' relative financial condition and obligations; the parties' education; the size of the separate estates; the age, health, and physical conditions of the parties; fault in breaking up the marriage; the benefits which the party not at fault would have received had the marriage continued; and the probable need for future support. *Murff*, 615 S.W.2d at 699; *In re Marriage of C.A.S.*, 405 S.W.3d at 384.

In our case, the Trial Court heard evidence regarding the *Murff* factors among other matters.

Nature of the marital property. The present wealth of the estate was almost

19

entirely in real estate and retirement benefits. The total community property real estate was valued by Dwight at $1,046,000 [2RR204 ¶¶1-4] and was valued by Maribel at $961,000. [2RR133, ¶¶ 1-4] The Court awarded Maribel 100% of Ft. Velasco (either $265,000 or $350,000), 65% of the proceeds from the sale of 107 Nesmith (65% of the agreed value equals $354,900), and 100% of 118 Nesmith (agreed value of $75,000). [P-1, Ex.A; 2RR203; Decree CR88-89] The parties agreed that Dwight would be awarded 123 Nesmith (agreed value $75,000). [P-1, Ex.A; 2RR203; Decree CR88-89] The Court also awarded Dwight 35% of 107 Nesmith (his 35% share of the agreed value is $191,100). So Maribel was awarded $694,900 (using her values) or 72.3%, and Dwight was awarded $266,100 or 27.7%, of the community property real estate. If we use Dwight's value for Ft. Velasco, Maribel received $779,900 out of a total value of $1,046,000, which is 74.6% of the total, while Dwight received $266,100 of the total which is 25.4%

Community property retirement accounts totaled $1,157,552.[6] [P-1 at ¶¶ 18-25; W's I&A, P-2, 2RR220-21; H's I&A, P-3, 2RR24-42] The Court awarded Maribel the following (the number shown is her % share of the value): 50% of Roth IRA #9212 (W's half is $17,260.44); 50% of Roth IRA #4620 ($312,940.96); 50% of Roth IRA #9931 ($78,744.98); 50% of Ascensus Trust IRA #2370 ($32,481.50); 50% of

---

[6] The Parties did not use the same dates for the balances in the retirement plans. This Brief uses the balance on the most current date reflected on either party's Sworn I&A.

State Farm IRA #4612 ($55,525.50); 50% of State Farm IRA #9964 ($73,217.50), for a total award to Maribel of $570,170.88. [Decree, CR 89-90] The Court awarded Dwight the following (the number shown is his % share of the value): 100% of Roth IRA #9211 ($34,470.85); 50% of Roth IRA #4620 (H's half is $312,940.95); 50% of Roth IRA 9931 ($78,744.97); 50% of Ascensus Trust IRA #2370 ($32,481.35); 50% of State Farm IRA #4612 ($55,525.50); 50% of State Farm IRA #9964 ($73,217.50), for a total of $587,381.12. [Decree, CR 86-87] So Maribel was awarded $570,170.88 or 49.3%, and Dwight was awarded $587,381.12 or 50.7%, of the community property retirement funds. Cash on hand was split fairly evenly. [Decree, CR86 & 89]

Relative earning capacity and business opportunities. Dwight is an insurance agent. He started his business from scratch in 1988 [3RR91], 13 years before his marriage to Maribel on October 19, 2001. [2RR28] The parties' income tax returns show income of $345,045 in 2017 [P-16, 3RR44], $334,639 in 2018 [3RR45-46], $335,274 in 2021 [3RR46], and $207,719.12 through June 15, 2024 [3RR47].

Maribel's Instagram profile lists her capacity as "Broker | Consultant | Philanthropist | Singer-Songwritier & Voiceover." [P-43-D; 3RR113] She continues:

About

I am an Investment Real Estate Broker (CRS, GRI, e-PRO, AHWD) with a demonstrated history of working in the areas of real estate & mortgage, city planning/zoning, and music industries. I love to research and learn!

Top 5 Clifton Strengths: Strategic, Connectedness, Achiever, Arranger,

Learner.

For the last 21 years, I have devoted most of my time to philanthropics such as local politics, campaigns, church worship/bible studies, humanitarian issues, and local government service.

I am in a season of transformative change, and moving back into the workforce, full time.

Maribel is a licensed real estate broker (not just a realtor), with professional designations that only about one or two percent of the Realtors or brokers in the country have. [2RR84-85, 3RR30] She received a Counsel of Real Estate Specialist Designation and she is a Graduate of Realtor Institute. [3RR18] Her Instagram profile [W-43(d)] says:

Experience

Texas Real Estate Broker-Realtor

Maribel Hill - Full-time

Feb 1992 - Present - 32 yrs 4 mos

Grateful Hippies Brokerage LLC, formerly Maribel Hill Realty - Hybrid

Strategic Planning, Customer Service Management and +19 skills

Maribel says on her Instagram page that she was a mortgage broker for 10 yrs and 2 mos. *Id.* Maribel used her skills in real estate in acquiring some of the real estate that is being divided in this divorce. [2RR85-86] Maribel sits on the Zoning and Planning Board for Surfside Texas, where the parties own property. [3RR20] She is a member of the Houston Association of Realtors. [2RR21] Maribel has several business entities. One is Grateful Hippies, LLC, which managed the rental of a house on Yuca Street. [2RR86; 3RR32] This entity is awarded to Maribel in the divorce and Dwight says it can be used to conduct a real estate business, rental or sales. [2RR86-87] Maribel established a music publishing business called Restore Entertainment, LLC,

22

in March of 2017. [3RR60, 84] The parties agreed to sell the property at 111 Nesmith and put those funds in this LLC. [P-14, 3RR346] Maribel testified that the parties each put $40,000 into the company. [3RR26] Restore Entertainment has recordings of Maribel's songs, including an album. [2RR56-57; 3RR27] Maribel has 18,000 followers on her Facebook page for Maribel Hill Music. [3RR27] She also made a podcast that is on Spotify. *Id.* The Court awarded Restore Entertainment LLC to Maribel. [CR91, ¶ R-14] Before marriage, Maribel studied in 2006-2007 to become a gemologist [3RR27-28]; she also made jewelry. [3RR25] She sold items on Etsy. *Id.* She also operated a cannabis CBD business called Neurometics, which opened and closed during the COVID epidemic. [3RR29-31] Maribel is also an ordained minister and had a jewelry business during the marriage. [3RR30] While Maribel has not pursued just one career path, she is licensed and qualified to sell real estate.

Relative financial condition and obligations. The property division is analyzed on pp. 9-11 and 19-20 above. Maribel owns a separate property home valued at $1,050,000, minus a mortgage of $253,000, leaving equity of $797,000. She was awarded cash of $52,742. [Decree, ¶R-6.c, CR89]. The value of community property real estate awarded to Maribel comes to $694,900 (using her value of Ft. Velasco or $779,900 (using Dwight's value for Ft. Velasco, and the retirement funds awarded to Marabel amount to $570,170.88. She was awarded a diamond ring that Dwight valued at $75,000 and a diamond necklace that Dwight valued at $15,000. [Decree, CR89 ¶¶ R-5.d & e; 3RR135 ¶¶37 & 38] She was awarded two vehicles, valued at approximately $25,000. [Decree, CR 91 ¶¶ R-12 & R-13; 3RR135] Dwight was awarded cash of $52,742, and community property real estate valued at $266,100, and retirement funds amounting to $587,381.12. Dwight was awarded his insurance agency company which has no assets. He was awarded an automobile valued at $20,000 to $22,000. [3RR135]

The parties' education. Maribel graduated from the University of Texas at Austin with a B.A. degree in Economics. [P-43-D, 3RR17] Dwight's education is not reflected in the record.

The size of the separate estates. Maribel's separate property consists of 4647 Elsby Ave., in Dallas, Texas. Maribel valued this property at $1,050,000 based on a 10-19-2023 appraisal, minus a mortgage of $253,000, leaving equity of $797,000. [W's I&A, 2RR232] Dwight offered an independent appraisal of the property at $1,065,000 [P-6, 2RR11073], subtracted a mortgage of $252,245.55, leaving an equity of $812,754.45. [H's I&A, 2RR251] The parties are $15,754 apart on the equity, which is de minimis for purposes of appellate review, but the average between these two figures is $804,877.23. Dwight asserted a claim for reimbursement to his separate estate for using separate property funds to make capital improvements to the Elsby home. He testified that he sold a house he brought into the marriage and put the $79,635.27 proceeds into an account where they were used to pay for work on the Elsby home. [2RR36-37]. Maribel acknowledged that he put the sale proceeds into a community property account. [3RR14] Dwight described the improvements [2RR38-ff.] and offered a summary of expenditures. [P-16A] He testified that the expenditures increase the value of the property by $250,000. [2RR48] The Court did not award reimbursement per se, but the use of Dwight's separate property funds to benefit Maribel's separate estate or the community estate is a factor that the Trial Court could consider in the property division and this Court can consider in reviewing it. In *Smith v. Smith*, 620 S.W.2d 619, 623 (Tex. Civ. App.—Dallas 1981, no writ), this Court said that it was proper for the trial court to consider the use of wife's separate funds, "though not precisely traced," to make payments on community property land.

Dwight's separate property consists of: $1,031.62 in cash he received from his

24

parents' trust [H's I&A 2RR247, ¶16.1]; five insurance policies on his life that he owned before marriage [H's I&A, 2RR248-250; Decree, CR95-96], 36.74% of his State Farm termination payments [CR96], 36.74% of his extended termination payments [CR96], a laptop computer ($600) [H's I&A, 2RR250] and, a gun cabinet and gun collection ($500) [*Id.*]

Age, health, and physical conditions. The record does not reflect Maribel's age. Dwight is age 59 and 6 months. [2RR61] Maribel testified that she has neuropathy, RA, Hashimoto's thyroiditis, and fibrmoyalgia. [3RR51] The record does not reflect Dwight's health. Maribel testified that she will have a medical procedure next month for a vein in her left leg that is not functioning properly and causing pain. [3RR54]

Fault in breaking up the marriage. The Court granted the divorce based on insupportability, not on a fault ground. [Decree, CR85] This factor does not apply.

Benefits which the party not at fault would have received had the marriage continued. The marriage was ended because of discord or conflict of personalities between Dwight and Maribel that destroyed the legitimate ends of the marriage relationship and prevented any reasonable expectation of reconciliation. [CR 85] This factor does not apply.

The probable need for future support. Maribel listed her bills. [3RR53-54]. These include mortgage payment, maintenance, property taxes, life insurance, electricity, water, sewage, natural gas, trash, cable, cell phone, groceries, entertainment, charity, fuel, auto insurance, medical insurance,

Dwight's separate estate benefitted the community and Maribel's separate estates. Dwight's separate property contributions to Maribel's separate property house have been discussed. In addition to that benefit to her separate estate, Dwight brought into the marriage his profit sharing plan, which contained $96,031 in separate property funds. [2RR66] He rolled those funds over into IRA #4620, where they added value

and contributed earnings inside the IRA. Dwight did not trace the account, so the entire account was treated as community property. *Id.* The account had a value at trial of $625,882 and the Court divided it 50/50. [CR89, ¶ R-7.b] In addition to the *Murff* factors, "[c]ourts may also consider whether one spouse contributed less than an equal share to the family's finances or the development of the community estate." *In the Matter of Marriage of Williams and Williams*, No. 06-18-00041-CV *12 (Tex. App.-- Texarkana Dec. 7, 2018, pet. denied). In *Horlock v. Horlock*, 533 S.W.2d 52 (Tex. Civ. App.-- Houston [14th Dist.] 1975, writ dism'd), the husband commingled the proceeds of the sale of his separate property with the community property of the parties. The trial court awarded him reimbursement, which was affirmed on appeal. The appellate court observed: "[t]hroughout the marriage the husband utilized that foundation to provide for the appellant and to establish the $3,000,000 to $4,000,000 estate. Equity is well served by reimbursing him for that initial investment." *Id.* at 58. While in the present case the Trial Court did not award Dwight reimbursement for the $79,635.27 and $96,031 in separate property contributed to Maribel's separate and the community estates, it is nonetheless a factor that the Trial Court could consider in dividing the property.

Cannot render a different property division. Maribel asks this Court to reverse the property division and award $364,000 to her. [Appellant's Brief at 31] This the Court cannot do. If "reversible error affecting the `just and right' division of the community estate is found, the court of appeals must remand the case for a new division." *Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985).

### Response to Maribel's Second Issue Presented

The Trial Court did not abuse its discretion in determining the present value of Dwight's extended termination payments. There was sufficient evidence to support this decision.

26

Forensic CPA Stephen Fuqua evaluated the characterization of Dwight's termination payments and extended termination payments, based on information provided by State Farm. His Report states the results of his forensic evaluation. [P-21, 2RR535-ff.] Mr. Fuqua also testified on the subject. [2RR154-199] The salient dates are stated in his Report:

1. Mr. Hill commenced work with State Farm on 8-1-1988.
2. Dwight Hill and Maribel Hill were married 10-19-2001
3. Mr. Hill is still working for State Farm as of 6-17-24
4. Dwight Hill and Maribel Hill are seeking a divorce as of 6-17-24.

Fuqua observed that the "State Farm Termination agreements deal with deferred wages." He therefore was guided by Texas case law on deferred compensation and Professor Joseph W. McKnight's analysis of an appellate case involving State Farm termination payments. Mr. Fuqua observed:

In formulating my opinion as to the characterization of these benefits payable to Dwight Hill or Maribel Hill; I have made the following fractional determinations using the *Berry* formula-

Number of months prior to marriage and in the plan-8-1-1988 to 10-1-2001; 158 months

Number of months in the plan 8-1-1988 to 6-17-24; 430 months

Separate Property component as of 6-17-24; 158 months/430 months= 36.74%

Community Property component as of 6-17-24; 272 months/430 months= 63.26%

Assuming a divorce on 6-17-24;

Dwight Hill would be entitled to 68.37% of the future monthly State Farm termination benefits.

Maribel Hill would be entitled to 31.63% of the future monthly State Farm termination benefits.

27

*Berry v. Berry*, 647 S.W.2d 945 (Tex. 1983), established the controlling law on dividing deferred compensation when a spouse continues employment after the date of divorce. The Court said: "It is clear from the record in this case that twelve additional years of work following divorce, which included some twelve to fourteen pay raises, plus union contract negotiations for an improved benefits plan, brought about the increase in retirement benefits paid to Mr. Berry. These post-divorce increases cannot be awarded to Mrs. Berry, for to do so would invade Mr. Berry's separate property, which cannot be done." Dwight's termination payments are different from the retirement benefits in *Berry* because in *Berry* the retirement benefit increased over time. Dwight's termination payments, however, can fluctuate depending on circumstances. The termination payments are based on the 12-months of income leading up to or after termination, whichever is less. [Agent's Agreement, 2RR463, ¶IV.A.1(a), App. 4] Dwight's performance could decline depending on his production in the year before he retires. If it does, his actual payments could be less upon retirement than what was projected as of the date of divorce. The Trial Court recognized this and divided the termination payments by applying the percent of community ownership to the actual *Berry* valuation or to the actual retirement payment, whichever is less. The extended termination payments start at age 65 if Dwight is alive when the termination payments are exhausted. [3RR58-61] Because Dwight is over age 55 (he was age 59 years and 6 months) at the time of trial, and had

30 years of service, he is entitled to terminate his agency with State Farm which would advance the start of his early termination payments. *Id.* But the early start, according to State Farm, would cause the amount of each payment too be actuarially reduced from $6,776 to $4,169 per month. *Id.* [P-22, May 30, 2024 letter from State Farm, 2RR550, App. 8]

Dwight's extended payments are contingent on his not soliciting, directly or indirectly, any customer to cancel a State Farm Policy, or allow it to lapse, or to buy insurance from another company. [Agent's Agreement, P-20, 2RR461, App. 5] In *Dillon v. Anderson*, 358 S.W.2d 694 (Tex. Civ. App.--Dallas 1962, writ ref'd n.r.e.), this Court said that money received for a covenant not to compete is compensation for lost future earnings of the covenanting spouse. There is a condition to the termination payments that requires Dwight not to compete for the first year after termination, which requires a contribution from his separate estate to the community estate in order to avoid forfeiture of all termination payments. *See Ulmer v. Ulmer*, 717 S.W.2d 665, 666-68 (Tex. App.--Texarkana 1986, no writ) (the Court reversed an injunction prohibiting the husband from working in a particular industry after the divorce, "because an individual's right to practice his profession is not subject to division by the court"). The Trial Court did not deviate from the State Farm calculation of payments, but this contribution by Dwight's separate estate to benefit Maribel is a factor that could be considered a factor in the property division.

29

**Response to Maribel's Third Issue Presented**

The Trial Court did not abuse its discretion in denying Maribel's request for post-divorce spousal maintenance.

Maribel asked the Trial Court for the maximum amount of post-divorce maintenance for the maximum length of time, seven years at $5,000 per month (tax free). [3RR10].

The Standard of Appellate Review. In *Mehta v. Mehta*, 716 S.W.3d 126, 131 (Tex. 2025), the Court said: "A trial court's decision to award spousal maintenance is reviewed for an abuse of discretion." "While insufficiency of evidence is not an independent ground on which to challenge a spousal-maintenance award, an award that is not supported by legally sufficient evidence may constitute an abuse of discretion." Note that the standard for appellate review of spousal maintenance is *legal* sufficiency of the evidence. "Evidence is legally sufficient if there is 'more than a mere scintilla' to support a vital fact-finding, i.e., 'the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Id.* at 131. In legal sufficiency review, the appellate court does not re-weigh evidence pro and con. The sole question is whether more than a scintilla of evidence exists to support the trial court's judgment.

Maintenance. "Maintenance means an award in a suit for dissolution of a marriage of periodic payments from the future income of one spouse for the support of the

30

other spouse." Tex. Fam. Code. § 8.001(1). The purpose of spousal maintenance is "to provide temporary and rehabilitative support for a spouse whose ability for self-support is lacking or has deteriorated over time while engaged in homemaking activities and whose capital assets are insufficient to provide support." *O'Carolan v. Hopper*, 71 S.W.3d 529, 533 (Tex. App.–Austin 2002, no pet.). "An award of post-divorce spousal maintenance is, in effect, an award of the husband's future separate property following the division of community property." *In re Marriage of Day*, 497 S.W.3d 87, 92 (Tex. App.--Houston [14th Dist.] 2016, pet. denied). In *Mehta*, at p. 133, the Court said: "To determine whether a spouse is eligible for spousal maintenance, a court should look to the property available 'to provide for the spouse's minimum reasonable needs.'" The award of over $1.37 million of community property to Maribel in the divorce, on top of just under $800,000 in equity in her separate property residence, is discussed previously in this Brief.

Minimum Reasonable Needs. Tex. Fam. Code §§ 8.051 & 8.051(2)(B) provide that "the court may order maintenance for either spouse only if the spouse seeking maintenance will lack sufficient property, including the spouse's separate property, on dissolution of the marriage to provide for the spouse's minimum reasonable needs and: ... 2) the spouse seeking maintenance: ... (B) has been married to the other spouse for 10 years or longer and lacks the ability to earn sufficient income to provide for the spouse's minimum reasonable needs...." In *Mehta*, at 113, the Supreme Court

31

said: "Neither the Family Code nor case law defines 'minimum reasonable needs.' ... Rather, the trial court determines a spouse's minimum reasonable needs on a case-by-case, fact-specific basis." The Supreme Court cited this Court's decision in *Slicker*, 464 S.W.3d at 860. The Court in *Harwood v. Harwood*, No. 03-23-00455-CV, 2025 WL 2233982, at *4 (Tex. App.–Austin Aug. 6, 2025, no pet.), said: "'Minimum reasonable needs' is not defined in the Family Code. ... Trial courts generally have discretion to determine these needs on a case-by-case, fact-specific basis." *Accord Martinez v. Martinez*, No. 02-21-00353-CV, 2022 WL 17986023, at *2 (Tex. App.—Fort Worth Dec. 29, 2022, no pet.) ("the minimum reasonable needs for a particular individual is a fact-specific determination that should be made by the trial court on a case-by-case basis.").

Presumption against maintenance. Section 8.053(a) says "[i]t is a rebuttable presumption that maintenance under Section 8.051(2)(B) is not warranted unless the spouse seeking maintenance has exercised diligence in: (1) earning sufficient income to provide for the spouse's minimum reasonable needs; or (2) developing the necessary skills to provide for the spouse's minimum reasonable needs during a period of separation and during the time the suit for the dissolution of the marriage is pending." This divorce was filed on September 27, 2022. The case was tried beginning June 17, 2024. Maribel has had 21 months during the divorce to pursue opportunities to find a job in real estate, where she is a licensed broker. She has not

32

done so, and is disqualified to receive post-divorce maintenance. The Court in *Carlin v. Carlin*, 92 S.W.3d 902, 910 (Tex. App.--Beaumont 2002, no pet.) said: "[B]ecause [obligee] admittedly never attempted to seek employment that would provide for her 'minimum reasonable needs,' a finding that [she] proved she was unable to support herself … would be unreasonable."

Relevant Factors. Family Code Section 8.052 lists factors that a court may consider in deciding whether to order maintenance. It says that the court shall decide whether to award maintenance by considering *all relevant factors*, including:

(1) each spouse's ability to provide for that spouse's minimum reasonable needs independently, considering that spouse's financial resources on dissolution of the marriage;

(2) the education and employment skills of the spouses, the time necessary to acquire sufficient education or training to enable the spouse seeking maintenance to earn sufficient income, and the availability and feasibility of that education or training;

(3) the duration of the marriage;

(4) the age, employment history, earning ability, and physical and emotional condition of the spouse seeking maintenance;

(5) the effect on each spouse's ability to provide for that spouse's minimum reasonable needs while providing periodic child support payments or maintenance, if applicable;

(6) acts by either spouse resulting in excessive or abnormal expenditures or destruction, concealment, or fraudulent disposition of community property, joint tenancy, or other property held in common;

(7) the contribution by one spouse to the education, training, or increased earning

33

power of the other spouse;

(8) the property brought to the marriage by either spouse;

(9) the contribution of a spouse as homemaker;

(10) marital misconduct, including adultery and cruel treatment, by either spouse during the marriage; and

(11) any history or pattern of family violence, as defined by Section 71.004 [there was no allegation of evidence of family violence].

"Our courts have noted that spousal maintenance is 'intended to provide temporary and rehabilitative support for a spouse whose ability to support herself has eroded over time while engaged in homemaking activities and whose capital assets are insufficient to provide support.' ... Its purpose is to ameliorate the 'very real hardships' that would otherwise exist as the result of a divorce" *Mehta*, at 133.

Tex. Fam. Code § 8.055(a) caps the amount of spousal maintenance at the lesser of (1) $5,000; or (2) 20 percent of the spouse's average monthly gross income.

Support is considered in the property division. In a divorce, the issue of post-divorce maintenance is intertwined with the property division. In *In the Matter of the Marriage of Combs*, 958 S.W.2d 848, 851 (Tex. App.--Amarillo 1997, no writ), the Court said: "in making a division of the marital estate, trial courts ordinarily considered numerous factors, including: (l) relative earning capacities and business experience of the parties, (2) educational background of the parties, (3) size of separate estates, (4) the age, health and physical condition of the parties, (5) fault in

34

the dissolution of the marriage, (6) the benefits the innocent spouse would have received had the marriage continued, and (7) probable need for future support." The Court observed: "the factors to be considered in both the marital property division and the award of spousal maintenance are inextricably intertwined...." In the present case, it is presumed that the Trial Court considered those factors in making the property division. The property division amply meets Maribel's need for support. She has a home worth $1,065,000, with equity of $758,000. [3RR133; W's Separate Property ¶ 1] She was awarded $429,999 in community property real estate. She received $52,742 in cash outright. She will receive $354,900 when 107 Nesmith sells. She acknowledged that she could sell her beach-front property to help meet her minimum reasonable needs. [3RR10] She received $570,170.88 in retirement accounts. Maribel does not meet the standards for post-divorce maintenance.

The evidence is legally sufficient to support the Trial Court's decision not to award spousal maintenance. No abuse of discretion is shown.

### Response to Maribel's Fourth Issue Presented

> The absence of Findings of Fact and Conclusions of Law does not require further action by this Court because the appellate record is sufficient to review Appellant's complaints.

The failure of a trial court to issue findings of fact and conclusions of law does not require remedial action from the appellate court if the record demonstrates that the complaining party suffered no harm. *Las Vegas Pecan & Cattle Co., Inc. v.*

*Zavala County*, 682 S.W.2d 254, 256 (Tex. 1984). "The test for determining whether the complainant has suffered harm is whether the circumstances of the case would require an appellant to guess the reason or reasons that the judge has ruled against it." *Howe v. Howe*, 551 S.W.3d 236, 257 (Tex. App.--El Paso 2018, no pet.). In *Tenery v. Tenery*, 932 S.W.2d 29, 30 (Tex. 1996), the Court said: "The court of appeals correctly held that Wilbur was not harmed by the trial court's failure to make findings of fact and conclusions of law about the division of the marital estate because there was ample evidence in the record to support the judgment." In the recent case of *Mehta v. Mehta*, *supra*, the trial court awarded post-divorce support but did not indicate which of the three grounds specified in Family Code Section 8.052 it found to be the basis for maintenance. Absent findings, the Supreme Court considered the entire record and concluded that the evidence supported one of the statutory grounds for awarding maintenance and therefore affirmed the trial court.

In this case the record is extraordinarily clear on the Trial Court's rulings and the basis for them. Much of the property division was agreed to by the parties, leaving only a few issues in dispute. The Trial Court's oral rendition of judgment was particularly detailed. [3RR86-ff.] In a post-rendition hearing, Maribel's attorney and Dwight's attorney were able to ask the Court for clarifications of the ruling. The remedy for not having findings and conclusions is not reversal. It is abatement and remand for the trial court to issue findings and conclusions. In *Ad Villarai v. Chan Il*

*Pak*, 519 S.W.3d 132, 136 (Tex. 2017), the Court said: "When the trial court's failure is harmful, the preferred remedy is for the appellate court to direct the trial court to file the missing findings." This appeal would not be changed by such a process of abatement and remand. The issue of the sufficiency of the evidence to support the Trial Court's judgment and abuse of discretion will not change with findings and conclusions. Marisol has suffered no harm from the lack of findings and conclusions.

## PRAYER

Dwight L. Hill prays that the Trial Court's judgment be affirmed, and for general relief.

Respectfully submitted,

By: */s/ Richard R. Orsinger*

**ORSINGER, NELSON, DOWNING & ANDERSON, LLP**
Richard R. Orsinger
State Bar No. 15322500
richard@ondafamilylaw.com

425 Soledad, Suite 550
San Antonio, Texas 78205
Telephone: (210) 225-5567

**EPSTEIN FAMILY LAW, P.C.**
Robert Epstein
State Bar No. 24065206
robert@epsteinpc.com

5949 Sherry Lane, Suite 1070

Dallas, Texas 75225
Telephone: (972) 232-7673

Attorneys for Appellee,
Dwight L. Hill

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I certify that this document was produced on a computer using Corel WordPerfect X9, and contains 9,381 words, as determined by the computer software's word-count function, excluding the sections of the document listed in Texas Rule of Appellate Procedure 9.4(i)(3).

/s/ *Richard R. Orsinger*

## CERTIFICATE OF SERVICE

I certify that a true copy of this Appellee's Brief was served in accordance with rule 9.5 of the Texas Rules of Appellate Procedure on each party or that party's lead counsel as follows:

Date of service:     November 6, 2025
Method of service:     Via efile service and email
Lead attorney:     Marisol Lopez
     Texas State Bar No. 24050952
     **MARISOL LOPEZ LAW FIRM**
     301 W. Avenue D
     Garland, TX 75040
     Telephone: (972) 205-1110
     Marisol@lawyerforu.com

     Attorney for Appellant, Maribel L. Hill

/s/ *Richard R. Orsinger*
Richard R. Orsinger
Attorney for Appellee,
Dwight L. Hill, Appellee

| TAB | ITEM | Reference |
|-----|------|-----------|
| 1 | Husband's proposed property division [P-1.A] | 2RR204 |
| 2 | Wife's proposed property division [W-2] | 3RR133 |
| 3 | Stephen Fuqua's Report [P-21] | 2RR535 |
| 4 | State Farm's September 30, 2022 letter explaining the Agent's Agreement | 2RR1117 |
| 5 | State Farm Agent's Agreement | 2RR461 |
| 6 | Agents' Work Station Loan Agreement | 2RR513 |
| 7 | State Farm's April 7, 2023 letter setting out Termination Payments and calculating actuarial discount when extended payments are started before age 65 | 2RR537 |
| 8 | State Farm's May 30, 2024 letter setting out updated Termination Payments and calculating actuarial discount when extended payments are started before age 65 [P-22] | 2RR550 |

# In the Matter of the Marriage of Hill

| Note | Description | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|
| | **COMMUNITY ASSETS** | | | | | |
| | **REAL PROPERTY (including Mineral Interests)** | | | | | |
| 1 | **1211 Ft Velasco**, Surfside Beach, TX 77541; 2024 tax appraised value $307K | $350,000 | | $350,000 | 0% | 100% |
| 2 | **123 Nesmith Pl**, Surfside Beach, TX 77541 2024 tax appraised value $94,070 (this propoerty to H) | $75,000 | $75,000 | | 100% | 0% |
| 3 | **107 Nesmith Pl**, Sufside Beach, TX 77541 (W calls this 105, 103, & 101 Nesmith PZI in her I&A) **(H proposes being awarded 103 & 105)** | $546,000 | $364,000 | $182,000 | 67% | 33% |
| 4 | **118 Nesmith Pl**, Surfside Beach, TX 77541 2024 tax appraised value $94,070 (this property to W) | $75,000 | | $75,000 | 0% | 100% |
| | **CASH AND ACCOUNTS WITH FINANCIAL INSTITUTIONS (including Brokerage and Mutual Funds)** | | | | | |
| 5 | Cash on Hand (H) | $10,000 | $10,000 | | 100% | 0% |
| 6 | PNC Bank Checking account ending **6618** (H&W) a/o 06/07/2024 | $126 | $126 | | 100% | 0% |
| 7 | PNC Bank DLH Separate Savings account ending **2065** (H) a/o 06/07/2024 | $2 | $2 | | 100% | 0% |
| 8 | State Farm FCU Reglar Share Account / Dwight Hill ending 8951/member ID Savings account ending **2289 S1** (H&W) a/o 06/07/2024 | $204 | $102 | $102 | 50% | 50% |
| 9 | PNC Bank Personal Checking account ending **4643** (H&W) a/o 06/07/2024 | $9,231 | $4,616 | $4,616 | 50% | 50% |
| 10 | PNC Bank Ava Education Account Checking account ending **2033** (Ava, H&W) **used as a way to transfer money to Ava; H&W to be removed from this account** | for Ava | for Ava | for Ava | | |
| 11 | PNC Bank Checking account ending **2183** (H) a/o 06/07/2024 | $14,327 | $14,327 | | 100% | 0% |



EXHIBIT

A

**\*\*Assets and liabilities highlighted in yellow are stipulated to as to value and award.**

# In the Matter of the Marriage of Hill

| Note | Description | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|
| 12 | State Farm Funds Brokerage Joint Tenants account ending **5608** (H&W) a/o 06/07/2024 | $17,944 | $8,972 | $8,972 | 50% | 50% |
| 13 | JP Morgan Chase Bank Chase Checking ending **2507** (H&W) a/o 4/10/23 (**account closed**) | Closed | Closed | Closed | | |
| 14 | JP Morgan Chase Bank Chase Total Checking account ending **2380** (W) a/o 5/8/24; W appears to have transferred from Chase ending in 2507 | $52,742 | | $52,742 | 0% | 100% |
| | **CLOSELY HELD BUSINESS INTERESTS** | | | | | |
| 15 | **Restore Entertainment, LLC DBA Mousika Publishing** | X | | X | 0% | 100% |
| a | Chase Bank Complete Business Checking account ending in **6763** (W) a/o 5/8/24 | $544 | | $544 | 0% | 100% |
| b | Investment into Restore Entertainment from community | $89,502 | | $89,502 | 0% | 100% |
| 16 | **Dwight Hill Insurance Agency, Inc.** | See Termination Payments Below | X | | 100% | 0% |
| a | PNC Bank Business Checking account ending in **3338** (H&W) Distribute cash before trial and account stays in name of business; $3K will be remaining balance for operating purposes | | X | | 100% | 0% |
| b | 2022 Toyota 4Runner (in possession of W) | transfer to Ava | | | | |
| 17 | **Grateful Hippies LLC** | | | X | | |
| a | PNC Bank Business Checking account ending in **4123** (H&W) a/o 06/07/2024 | $264 | | $264 | 0% | 100% |

**Assets and liabilities highlighted in yellow are stipulated to as to value and award.

# In the Matter of the Marriage of Hill

| Note | Description | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|
| | **RETIREMENT ACCOUNTS AND OTHER DEFERRED COMPENSATION (Including Union Benefits)** | | | | | |
| 18 | State Farm Fund Maribel Hill Roth IRA ending in **9212** (W) a/o 5/8/24 | $30,500 | | $30,500 | 0% | 100% |
| 19 | State Farm Fund Dwight Hill Roth IRA ending in **9211 (H)** a/o 06/07/2024 | $34,471 | $34,471 | | 100% | 0% |
| 20 | State Farm Pershing **4620** ROTH IRA formerly State Farm BlackRock **A6KTA** (current account balance as of06/07/2024); Dwight's account; account is of mixed character | $625,882 | $625,882 | | 100% | 0% |
| 21 | State Farm Pershing **9931** ROTH IRA formery State Farm BlackRock **A6KTA** (current account balance as of 06/07/2024); Dwight's account; account is of mixed character | $157,490 | $157,490 | | 100% | 0% |
| 22 | Ascensus Trust IRA Services account ending in **2370 (also known as State Farm Brokerage Investment 6955 - subaccount)** (H) a/o 06/06/2024 | $64,963 | $64,963 | | 100% | 0% |
| 23 | Ascensus Trust IRA Services account ending in **2370 (also known as State Farm Brokerage Investment 6955 - subaccount)** (W) a/o 5/8/24 | $49,752 | | $49,752 | 0% | 100% |
| 24 | State Farm Blackrock Maribel L Hill ending in **C17dn** (W) a/o 4/22/24 | $109,964 | | $109,964 | 0% | 100% |
| 25 | State Farm Blackrock Maribel L Hill ROTH IRA ending in **C9ASY** (W) a/o 4/22/24 | $143,926 | | $143,926 | 0% | 100% |
| | **OTHER DEFERRED COMPENSATION BENEFITS** | | | | | |
| 26 | Termination Payments for H employment through SF paid out monthly after H retires; CP portion is 63.26%; therefore, W receives 31.63% of termination pay ($2,143.25) if, as, and when received by H. With respect to extended term pay, W will receive 31.63% of actuarially reduced portion if, as, and when received by H | Unknown since contingent asset | X | X | 68.37% | 31.63% |

**Assets and liabilities highlighted in yellow are stipulated to as to value and award.

# In the Matter of the Marriage of Hill

| Note | Description | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|
| **MOTOR VEHICLES, BOATS, AIRPLANES, CYCLES, ETC.** | | | | | | |
| 27 | Honda Scooter Elite (Name on title: H); at 4647 Elsby; W claims her name is on title | $600 | $600 | | 100% | 0% |
| 28 | 2014 Club Car Gas xtr 850 (Name on title: H); at 1211 Surfside Beach | $5,000 | | $5,000 | 0% | 100% |
| 29 | 2010 Lexus LX570 (Name on title: H&W); in possession of H (No lien) | $20,000 | $20,000 | | 100% | 0% |
| 30 | 2021 Mazda CX-5 (Name on title: W); in possession of Ava | $25,000 | | $25,000 | 0% | 100% |
| 31 | 2022 Ford F-150 (Name on title: H&W); in possession of Jacob ($45,000 FMV less $2,157 owed a/o 10/25/23; paid off a/o 3/12/24) **Vehicle to be given to Jacob** | | | | | |
| **MISCELLANEOUS ASSETS** | | | | | | |
| 32 | Clothes, bicycle, books, guitar, tools (poss: H) | $5,000 | $5,000 | | 100% | 0% |
| 33 | Household furnishings, musical instruments & tools | $8,000 | | $8,000 | 0% | 100% |
| 34 | Computer monitors (x2) (poss: H) | $100 | $100 | | 100% | 0% |
| 35 | Glock 26 (poss: H) | $500 | $500 | | 100% | 0% |
| 36 | Sig P238 (poss: W) | $600 | | $600 | 0% | 100% |
| 37 | 4.53 ct Diamond/Platinum Ring (poss: W) | $75,000 | | $75,000 | 0% | 100% |
| 38 | Diamond necklace (poss: W) | $15,000 | | $15,000 | 0% | 100% |
| 39 | Maribel Hill Music | unknown | | X | 0% | 100% |
| 40 | Unknown jewelry and papers in PNC Bank Safe-Deposit Box | TBD | | | | |

**\*\*Assets and liabilities highlighted in yellow are stipulated to as to value and award.**

# In the Matter of the Marriage of Hill

| Note | Description | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|
| **INSURANCE** | | | | | | |
| 41 | State Farm ending in **2752** Whole (H); $250K face value (W is beneficiary); date of issue is 09/25/1989; therefore, it is H's SP a/o 06/04/2024 | $ 94,997 | $94,997 | | 100% | 0% |
| 42 | State Farm ending in **5601** Whole (H); $10K face value (W is beneficiary); date of issue is 08/23/1988; therefore, it is H's SP a/o 06/04/2024 | $ 4,020 | $4,020 | | 100% | 0% |
| 43 | State Farm ending in **2655** Whole (H); $25K face value (W is beneficiary); date of issue is 09/25/1989; therefore, it is H's SP a/o 06/04/2024 | $ 9,709 | $9,709 | | 100% | 0% |
| 44 | State Farm ending in **8176** Whole (H); $10K face value (W is beneficiary); date of issue is 09/28/1990; therefore, it is H's SP a/o 5/15/24 | $ 4,667 | $4,667 | | 100% | 0% |
| 45 | State Farm ending in **0889** Whole (Garrett insured; owner TBD); $50k face value; W is beneficiary; however, date of issue is 05/24/1990; therefore, it is H's SP a/o 5/15/24 | transfer to Garrett | | | | |
| 46 | State Farm ending in **2774** Whole (H); $250K face value (W is beneficiary); date of issue is 09/25/1989; therefore, it is H's SP a/o 06/04/2024 | $ 90,128 | $90,128 | | 100% | 0% |
| 47 | State Farm ending in **2821** Term (H); $500K face value | no CSV | X | | 100% | 0% |
| 48 | State Farm ending in **3643** Term (W); $400K face value | no CSV | | X | 0% | 100% |
| 49 | State Farm ending in **0051** Whole (H owner; Ava Hill insured); $50K face value (W is beneficiary) | transfer to Ava | | | | |
| 50 | State Farm ending in **1479** Whole (H owner; Jacob Hill insured); $50K face value (W is beneficiary | transfer to Jake | | | | |

**Assets and liabilities highlighted in yellow are stipulated to as to value and award.

# In the Matter of the Marriage of Hill

| Note | Description | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|------|-------------|------------------------|------------|---------|--------------------|-----------------| 
| **REIMBURSEMENT CLAIMS** | | | | | | |
| 51 | Reduction of principal amount of debt on 4647 Elsby Avenue, Dallas, TX 75209 | $77,600 | | $77,600 | 0% | 100% |
| 52 | H's Separate Property Funds from sale of Clubway House lost to commingling (See Ex. P-8, HUD 1) | $79,635 | | $79,635 | 0% | 100% |
| 53 | Enhancement in value to W's SP residence at 4647 Elsby Avenue, Dallas, TX 75209 paid with community property funds, including a loan of $100,000 | $250,000 | | $250,000 | 0% | 100% |
| | | | | | | |
| | **Totals** | **$3,223,392** | **$1,589,671** | **$1,633,721** | **49%** | **51%** |
| **COMMUNITY LIABILITIES** | | | | | | |
| **CREDIT CARDS AND CHARGE ACCOUNTS** | | | | | | |
| 1 | Chase Bank, Acct ending **9682** (W) a/o 5/8/24 | ($95) | | ($95) | 0% | 100% |
| 2 | Chase Bank, Acct ending **7039** (W) a/o 5/8/24 | ($870) | | ($870) | 0% | 100% |
| 3 | CapitalOne, Acct ending **0864** (H) a/o 3/12/24 | $0 | $0 | | 100% | 0% |
| **ATTORNEY'S FEES IN THIS CASE** | | | | | | |
| 4 | Epstein Family Law, P.C. | accruing | X | | 100% | 0% |
| 5 | Armstrong Divorce and Family Law, PLLC | nothing owed | | nothing owed | 0% | 100% |
| 6 | Marisol Lopez | unknown | | X | 0% | 100% |
| **OTHER PROFESSIONAL FEES IN THIS CASE** | | | | | | |
| 7 | Stephen Fuqua | $0 | $0 | | 100% | 0% |
| **OTHER LIABILITIES NOT OTHERWISE LISTED** | | | | | | |
| 8 | State Farm FCU Line of Credit ending **2289** (a/o 3/12/24) | $0 | $0 | | 100% | 0% |
| | | | | | | |
| | **Totals** | **($965)** | **$0** | **($965)** | **0%** | **100%** |

**Assets and liabilities highlighted in yellow are stipulated to as to value and award.

# In the Matter of the Marriage of Hill

| Note | Description | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|
| | | | | | | |
| **SUMMARY OF PROPOSED DIVISION OF COMMUNITY PROPERTY** | | | | | | |
| | | | **Husband** | **Wife** | | |
| | Grand Total of Assets | $3,223,392 | $1,589,671 | $1,633,721 | | |
| | Less Community Unsecured Liabilities | ($965) | $0 | ($965) | | |
| | Net Value of Estate | $3,222,427 | $1,589,671 | $1,632,756 | | |
| | Payment from Wife to Husband to Equalize Division | | $21,542 | ($21,542) | | |
| | Total Division | $3,222,427 | $1,611,213 | $1,611,214 | | |
| | Percentage Division | | 50% | 50% | | |
| | | | | | | |
| | 50 Percent of Net Estate | | $1,611,214 | $1,611,214 | | |
| | Over : (Short) | | ($0) | $0 | | |
| | | | | | | |
| | | | | | | |
| **HUSBAND'S SEPARATE PROPERTY** | | | | | | |
| No. | Description | | **Value of Property** | | | |
| 1 | PNC Checking Account **1641** (Inheritance from Parents) a/o 5/15/24 | | $9,031.54 | | | |
| 2 | Levovo Laptop (bought with separate property monies) | | $600.00 | | | |
| 3 | Gun Cabinet with Gun Collection (gift and purchases) | | $5,000.00 | | | |
| 4 | Gibson J45 Guitar to be given to Jacob Hill (purchased 1997) | | $2,000.00 | | | |
| 5 | Life insurance policies (see above) | | $202,813.00 | | | |
| 6 | Reimbursement claim against Elsby (see above) | | $79,000.00 | | | |
| | | | | | | |
| Total | | | $298,445 | | | |
| | | | | | | |

**Assets and liabilities highlighted in yellow are stipulated to as to value and award.

Page 7

# In the Matter of the Marriage of Hill

| Note | Description | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|
| **WIFE'S SEPARATE PROPERTY** | | | | | | |
| No. | Description | | | **Value of Property** | | |
| 1 | 4647 Elsby Ave 75209 (FMV=$1,065,000 - Mort $252,245.55) a/o 06/07/2024 **LESS $79,000 reimbursement claim on H's SP for Clubway funds and LESS $216,654 for CP principal reduction LESS $100,000 for CP capital improoments (see eimbursements above)**; W to refinance the property within 120 days of the date of divorce or otherwise remove H from the mortgage by such time | | | $417,100 | | |
| Total | | | | $417,100 | | |
| | | | | | | |
| **CHILDREN'S PROPERTY** | | | | | | |
| No. | Description | **Value of Property** | | | | |
| 1 | Blackrock Coverdell, Acct ending 2281 (Ava) (Maribel Custodian) a/o 05/07/2024 | $ 38,038.00 | | to be transferred to Ava | | |
| 2 | Blackrock Coverdell, Acct ending 4121 (Jacob) (Maribel Custodian) a/o 05/07/2024 | $ 78,965.00 | | to be transferred to Jacob | | |
| 3 | State Farm Funds Coverdell, Acct ending 9274 (Jacob) (Maribel Custodian) a/o 06/07/2024 | $ 9,829.99 | | to be transferred to Jacob | | |

**Assets and liabilities highlighted in yellow are stipulated to as to value and award.

Page 8

# In the Matter of the Marriage of Hill

| Note | Description | Wife's Proposed Value | Husband's Proposed Value | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|---|---|
| | **COMMUNITY ASSETS** | | | | | | | |
| | **REAL PROPERTY (including Mineral Interests)** | | | | | | | |
| 1 | **1211 Ft Velasco**, Surfside Beach, TX 77541 | $265,000 | $350,000 | | | $265,000 | 0% | 100% |
| 2 | **123 Nesmith Pl**, Surfside Beach, TX 77541 (agreed) | $75,000 | $75,000 | | $75,000 | | 100% | 0% |
| 3 | **107 Nesmith Pl**, Sufside Beach, TX 77541 (Lots 1, 2 & 3) Lot 3 is currently for sale but price needs to be lowered (Propose Lot 1 for W, Lot 2 for H and Lot 3 sold) | $546,000 | $546,000 | | $273,000 | $273,000 | 50% | 50% |
| 4 | **118 Nesmith Pl**, Surfside Beach, TX 77541  (Agreed) | $75,000 | $75,000 | | | $75,000 | 0% | 100% |
| | **CASH AND ACCOUNTS WITH FINANCIAL INSTITUTIONS (including Brokerage and Mutual Funds)** | | | | | | | |
| 5 | Cash on Hand (H) | | $10,000 | | $10,000 | | 100% | 0% |
| 6 | PNC Bank Checking account ending **6118** (H&W) a/o 6/10/24 (agreed) | | $126 | | $126 | | 100% | 0% |
| 7 | PNC Bank DLH Separate Savings accountending **2065** (H) a/o 5/15/24 (agreed) | | $27 | | $27 | | 100% | 0% |
| 8 | State Farm FCU Reglar Share Account / Dwight Hill ending 8951/member ID Savings account ending **2289 S1** (H&W) a/o 5/15/24 (agreed) | | $204 | | $102 | $102 | 50% | 50% |
| 9 | PNC Bank Personal Checking account ending **4643** (H&W) a/o 6/10/24 (agreed) | | $8,533 | | $4,267 | $4,267 | 50% | 50% |
| 10 | PNC Bank Ava Education Account Checking account ending **2033** (Ava, H&W) a/o 6/10/24 **used as a way to transfer money to Ava** (agreed) | $2,097 | for Ava | | for Ava | for Ava | | |
| 11 | PNC Bank Checking account ending **2183** (H) a/o 5/15/24 (agreed) | | $14,327 | | $14,327 | | 100% | 0% |
| 12 | State Farm Funds Brokerage Joint Tenants account ending **5608** (H&W) a/o 6/10/24 (agreed) | | $17,978 | | $8,989 | $8,989 | 50% | 50% |
| 13 | JP Morgan Chase Bank Chase Checking ending **2507** (H&W) a/o 4/10/23 (**account closed**) | | Closed | | Closed | Closed | | |
| 14 | JP Morgan Chase Bank Chase Total Checking account ending **2380** (W) a/o 5/8/24; W transferred from Chase ending in 2507 (Agreed separate acct); H had an acct also receiving same amount. | $52,742 | $52,742 | | | $52,742 | 0% | 100% |



PLAINTIFF'S EXHIBIT
Amended
W 2

# In the Matter of the Marriage of Hill

| Note | Description | Wife's Proposed Value | Husband's Proposed Value | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|---|---|
| | **CLOSELY HELD BUSINESS INTERESTS** | | | | | | | |
| 15 | **Restore Entertainment, LLC DBA Mousika Publishing** | | X | | | X | 0% | 100% |
| a | Chase Bank Complete Business Checking account ending in **6763** (W) a/o 5/8/24 (agreed) | | $544 | | | $544 | 0% | 100% |
| b | Investment into Restore Entertainment from community (both were investors & both lost money) | $0 | $80,000 | | | $0 | 0% | 100% |
| 16 | **Dwight Hill Insurance Agency, Inc.** (appraisal not updated with higher numbers though income higher) | > $ 728,000 | $0 | | $400,000 | $400,000 | 50% | 50% |
| a | PNC Bank Business Checking account ending in **3338** (H&W) a/o 05/15/24 (Agreed leave $ 3k and split remainder) | $2,441 | | | X | | 50% | 50% |
| b | 2022 Toyota 4Runner (in possession of Ava) a/o 05/31/24; (Agreed title to Ava Hill) | $43,000 | | | | | 0% | 0%% |
| 17 | **Grateful Hippies LLC (Agreed assign to wife)** | $0 | | | | X | 0% | 100% |
| a | PNC Bank Business Checking account ending in **4123** (H&W) a/o 5/15/24 (Agreed) | | $117 | | | $117 | 0% | 100% |
| | **RETIREMENT ACCOUNTS AND OTHER DEFERRED COMPENSATION (Including Union Benefits) 50/50 as of** | | | | | | | |
| 18 | State Farm Fund Maribel Hill Roth IRA ending in **9212** (W) a/o 6/10/24 | $34,521 | $30,500 | | $17,261 | $17,261 | 50% | 50% |
| 19 | State Farm Fund Dwight Hill Roth IRA ending in **9211** (H) a/o 5/15/24 | | $33,815 | | $16,908 | $16,908 | 50% | 50% |
| 20 | State Farm Pershing **4620** ROTH IRA formerly State Farm BlackRock **A6KTA** (current account balance as of 5/8/24); Dwight's account; account is of mixed character | | $615,382 | | $307,691 | $307,691 | 50% | 50% |
| 21 | State Farm Pershing **9931** ROTH IRA formery State Farm BlackRock **A6KTA** (current account balance as of 5/15/24); Dwight's account; account is of mixed character | | $155,547 | | $77,774 | $77,774 | 50% | 50% |
| 22 | Ascensus Trust IRA Services account ending in **2370** (also known as **State Farm Brokerage Investment 6955 - subaccount**) (H) a/o 5/8/24 | | $63,078 | | $31,539 | $31,539 | 50% | 50% |
| 23 | Ascensus Trust IRA Services account ending in **2370** (also known as **State Farm Brokerage Investment 6956 - subaccount**) (W) a/o 6/7/24 | $50,650 | $49,752 | | $25,325 | $25,325 | 50% | 50% |
| 24 | State Farm Blackrock Maribel L Hill ending in **C17dn** (W) same as 4612 a/o 6/10/24 | $111,051 | $109,964 | | $55,526 | $55,526 | 50% | 50% |

| Note | Description | Wife's Proposed Value | Husband's Proposed Value | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|---|---|
| 25 | State Farm Blackrock Maribel L Hill ROTH IRA ending in **C9ASY same as 9964 a/o 6/10/24** | $146,435 | $143,926 | | $73,218 | $73,218 | 50% | 50% |
| | **OTHER DEFERRED COMPENSATION BENEFITS** | | | | | | | |
| 26 | Termination Payments for H employment through SF paid out monthly after H retires; 66% to Husband and 34 % to wife = $ 2,710.40 first 5 years an d then $ 2,680.40 after 5 years forward); H gets $ 4,472.16 first 5 years and $ 2,680.40 after first 5 years; H will actually get more by teh time he retires | | | | | | 66% | 34% |
| | **MOTOR VEHICLES, BOATS, AIRPLANES, CYCLES, ETC.** | | | | | | | |
| 27 | Honda Scooter Elite (Name on title: H); at 4647 Elsby; W claims her name is on title | $600 | $600 | | $600 | | 100% | 0% |
| 28 | 2014 Club Car Gas xtr 850 (Name on title: H); at 1211 Surfside Beach (goes w whoever has Velasco) | $2,500 | $5,000 | | | | | |
| 29 | 2010 Lexus LX570 (Name on title: H&W); in possession of H (No lien) ( Agreed) | $22,000 | $20,000 | | $20,000 | | 100% | 0% |
| 30 | 2021 Mazda CX-5 (Name on title: W); in possession of Wife ( Agreed) | $24,000 | $25,000 | | | $25,000 | 0% | 100% |
| 31 | 2022 Ford F-150 (Name on title: H&W); in possession of Jacob ($45,000 FMV less $2,157 owed a/o 10/25/23; paid off a/o 3/12/24) **Vehicle to be titled to Jacob Hill. Agreed** | $48,000 | | | | | | |
| | **MISCELLANEOUS ASSETS** | | | | | | | |
| 32 | Clothes, bicycle, books, guitar, tools (poss: H) | | $5,000 | | $5,000 | | 100% | 0% |
| 33 | Household furnishings, musical instruments & tools (Agreed) | $5,000 | $8,000 | | | $5,000 | 0% | 100% |
| 34 | Computer monitors (x2) (poss: H) (Agreed) | | $100 | | $100 | | 100% | 0% |
| 35 | Glock 26 (poss: H) (Agreed) | | $500 | | $500 | | 100% | 0% |
| 36 | Sig P238 (poss: W) (Agreed) | $450 | $600 | | | $450 | 0% | 100% |
| 37 | 4.53 ct Diamond/Platinum Ring (poss: W) (can nsure jewlrey w no appraisal but not even insured for that amount); gift to W | no appraisal/gift | $75,000 | | | | 0% | 100% |
| 38 | Diamond necklace (poss: W); (can insure for whatever but not even insured for that); Gift to W | no appraisal/gift | $15,000 | | | | 0% | 100% |
| 39 | Maribel Hill Music (Agreed) | $0 | unknown | | | $0 | 0% | 100% |

| Note | Description | Wife's Proposed Value | Husband's Proposed Value | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|---|---|
| 40 | Unknown jewelry and papers in PNC Bank Safe-Deposit Box (Agreed) | | TBD | | | | 0% | 100% |
| INSURANCE | | | | | | | | |
| 41 | State Farm ending in **2752** Whole (H); $250K face value (W is beneficiary); date of issue is 09/25/1989; acct in debt of 16,819.20 as of 10/15/2001; a/o 6.4.24 | $94,997 | | | $ - | $94,997 | 0% | 100% |
| 42 | State Farm ending in **5601** Whole (H); $10K face value (W is beneficiary); date of issue is 08/23/1988; therefore, it is not H's SP a/o 6/4/24 bc paid the premiums throughout marriage | $4,020 | | | $4,020.39 | | 100% | 0% |
| 43 | State Farm ending in **2655** Whole (H); $25K face value (W is beneficiary); date of issue is 09/25/1989; therefore, it is not H's SP a/o 6/4/24 bc paid premiums for 23 years | $9,709 | | | $ - | $9,709 | 0% | 100% |
| 44 | State Farm ending In **8176** Whole (H); $10K face value (W is beneficiary); date of issue is 09/28/1990; therefore, it is not H's SP a/o 6/4/24 bc paid premiums for 23 years | $4,684 | | | $4,683.51 | | 100% | 0% |
| 45 | State Farm ending in **0889** Whole (Garrett insured; owner TBD); $50k face value; W is beneficiary; however, date of issue is 05/24/1990; therefore, it is not H's SP a/o 6/4/24 bc paid premiums for 23 years (Agreed title to Garrett) | $8,369 | | | $ - | | 0% | 0% |
| 46 | State Farm ending in **2774** Whole (H); $250K face value (W is beneficiary); date of issue is 09/25/1989;acct was in debt of $20,304.47 as of 10/15/01 a/o 6/4/24 | $90,128 | | | $90,128.00 | | 100% | 0% |
| 47 | State Farm ending in **2821** Term (H); $500K face value | | no CSV | | X | | 100% | 0% |
| 48 | State Farm ending in **3643** Term (W); $400K face value | | no CSV | | | X | 0% | 100% |
| 49 | State Farm ending in **0051** Whole (H owner; Ava Hill insured); $50K face value (W is beneficiary) a/o 6/4/24 (Agreed title ownership to Ava Hill) | $2,841 | $2,841 | | | | 0% | 0% |
| 50 | State Farm ending in **1479** Whole (H owner; Jacob Hill insured); $50K face value (W is beneficiary) a/o 6/4/24 (Agreed Title ownership to Jacob Hill) | $3,151 | $3,318 | | | | 0% | 0% |

| Note | Description | Wife's Proposed Value | Husband's Proposed Value | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|---|---|
| **REIMBURSEMENT CLAIMS** | | | | | | | | |
| 51 | H claims reduction of princpal amount of debts secured by liens on W's SP residence at 4647 Elsby Avenue, Dallas, Texas 75209. But no reimbursement claim exists as the mortgage is 3 times higher than before marriage; and H received benefit & was already compensated by acquiring paid off assets with the equity money out of separate property & never paid back the equity $ he withdrew on the separate property) H owes $ 126,000 to Elsby or wife needs Ft. Velasco free and clear as equity of Elsby is in that home while the mortgage remains on Elsby. | H owes $ 126,000.00 to Elsby (half mortgage) | $378,000 | | | | 0% | 0% |
| 52 | H's Separate Property Funds DID NOT invest in capital improvements to W's SP residence at 4647 Elsby Avenue, Dallas, TX 75209 from Clubway House. Mortgage was placed on it and W had $ 83,000 from insurance. | $0 | $79,000 | | | $0 | 0% | 0% |
| 53 | There are no community property funds invested in capital improvements to W's SP residence at 4647 Elsby Ave, Dallas, Texas 75209 ($83,000 came from insurance claim premarital & $ 100,000 was a loan afer marriage that was never paid back & is part of existing mortgage debt; loan is 3 times higher than before marriage and H benefited as he is receiving property w no mortgage bc derived from Elsby and Elsby has the debt | $0 | $100,000 | | $0 | $0 | 0%% | 0%% |
| | Totals | | | | $1,516,109 | $1,820,158 | | |
| | **COMMUNITY LIABILITIES** | | | | | | | |
| | **CREDIT CARDS AND CHARGE ACCOUNTS** | | | | | | | |
| 1 | Chase Bank, Acct ending **9682** (W) a/o 5/8/24 (Agreed) | | ($95) | | | ($95) | 0% | 100% |
| 2 | Chase Bank, Acct ending **7039** (W) a/o 5/8/24 (Agreed) | | ($870) | | | ($870) | 0% | 100% |
| 3 | CapitalOne, Acct ending **0864** (H) a/o 3/12/24 (Agreed) | | $0 | | $0 | | 100% | 0% |
| | **ATTORNEY'S FEES IN THIS CASE** | | | | | | | |

# In the Matter of the Marriage of Hill

| Note | Description | Wife's Proposed Value | Husband's Proposed Value | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|------|-------------|------------------------|---------------------------|--------------------------|------------|---------|---------------------|-----------------|
| 4 | Epstein Family Law, P.C. (Agreed) | | accruing | | X | | 100% | 0% |
| 5 | Armstrong Divorce and Family Law, PLLC (Agreed) | | unknown | | | X | 0% | 0% |
| 6 | Marisol Lopez (Agreed) | | unknown | | | X | 0% | 100% |
| **OTHER PROFESSIONAL FEES IN THIS CASE** | | | | | | | | |
| 7 | Stephen Fuqua (Agreed) | | $0 | | $0 | | 100% | 0% |
| **OTHER LIABILITIES NOT OTHERWISE LISTED** | | | | | | | | |
| 8 | State Farm FCU Line of Credit ending **2289** (a/o 3/12/24) (Agreed) | | $0 | | $0 | | 100% | 0% |
| 9 | Real Property taxes (50/50 paid on taxes up to date of divorce) and split any tax refunds or rebates on tax returns filed during marriage | | | | | | | |
| | | | | | | | | |
| | **Totals** | | ($965) | | $0 | ($965) | 0% | 100% |
| | | | | | | | | |
| **SUMMARY OF PROPOSED DIVISION OF COMMUNITY PROPERTY** | | | | | | | | |
| | | | | | **Husband** | **Wife** | | |
| | Grand Total of Assets | | $0 | | $1,516,109 | $1,820,158 | | |
| | Less Community Unsecured Liabilities | | ($965) | | $0 | ($965) | | |
| | Net Value of Estate | | ($965) | | $1,516,109 | $1,819,193 | | |
| | Percentage Division | | | | -157183% | -188605% | | |
| | 50 Percent of Net Estate | | | | ($482) | ($482) | | |
| | Over : (Short) | | | | $1,516,591 | $1,819,675 | | |
| | | | | | $ 265k Ft. Velasco for portion of Elsby mortgage+ $ 52k H already got) | | | |

# In the Matter of the Marriage of Hill

| Note | Description | Wife's Proposed Value | Husband's Proposed Value | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|---|---|
| **HUSBAND'S SEPARATE PROPERTY** | | | | | | | | |
| No. | Description | | | | Value of Property | | | |
| 1 | PNC Checking Account **1641** (check issued for 1/4 land sale from Bill Hill) a/o 5/15/24 (not separate property) | $167,195 | $9,031.54 | | $83,598.00 | $83,598 | 50% | 50% |
| 2 | Levovo Laptop (bought with separate property monies) | | | | $600.00 | | 100% | 0% |
| 3 | Gun Cabinet with Gun Collection (gift and purchases) | | | | $5,000.00 | | 100% | 0% |
| 4 | Gibson J45 Guitar to be given to Jacob Hill (purchased 1997) | | | | $2,000.00 | | 0% | 0% |
| 5 | Life insurance policies (see above) | | | | | | | |
| 6 | Reimbursement claim against Elsby (see above) | $0 | | | | | | |
| | | | | | | | | |
| Total | | | | | $91,198 | | | |
| | | | | | | | | |
| **WIFE'S SEPARATE PROPERTY** | | | | | | | | |
| No. | Description | | | | | Value of Property | | |
| 1 | Elsby SP | | | | | | | |
| Total | 4647 Elsby Ave 75209 (FMV=$1,065,000 - Mort $258,325.320) a/o 10/25/2023 (W FMV = $758,000) W to continue to pay loan and sign hold harmless for H. Separate property that is now 3 times more in debt than prior to marriage. H owes half the mortgage or W gets Ft Velasco in exchange for his portion of debt in Elsby. | | | | | not relevant | | 100% |
| | | | | | | | | |
| **CHILDREN'S PROPERTY** | | | | | | | | |
| No. | Description | | Value of Property | | | | | |
| 1 | Blackrock Coverdell, Acct ending 2281 (Ava) (Maribel Custodian) a/o 5/7/24 (Agreed to title to Ava Hill) | | $38,038.00 | | | | 0% | 0% |
| 2 | Blackrock Coverdell, Acct ending 4121 (Jacob) (Maribel Custodian) a/o 5/7/24 (Agreed to titile to Jacob Hill) | | $78,965.32 | | | | 0% | 0% |
| 3 | State Farm Funds Coverdell, Acct ending 9274 (Jacob) (Maribel Custodian) a/o 6/7/24 (Agreed to title to Jacob Hill) | | $9,829.99 | | | | 0% | 0% |
| | | | | | | | | |
| | OTHER REQUESTS: | | | | | | | |

| Note | Description | Wife's Proposed Value | Husband's Proposed Value | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|---|---|
| | HEALTH INSURANCE ( W needs health insurance for 3 years as she suffers from autoimmune diseases) | | | | | | | |
| | ALIMONY (W needs $ 5,000/mo for 7 years) | | | | | $5,000 | | 100% |
| | | | | | | | | |

# FARMER, FUQUA & HUFF P.C.
## Accountants and Consultants

2435 N. Central Expy, Suite 700
Richardson, Texas 75080

P. 214.473.8000
F. 214.473.8007



May 24, 2024

Mr. Dwight Hill

c/o Robert Epstein

Epstein Family Law, P.C.

5949 Sherry Lane #1070

Dallas, TX 75225

Dear Mr. Hill,

You have asked me to formulate my opinion concerning the characterization of Termination payments and the Extended Termination Payments from State Farm Mutual Insurance Company (hereafter State Farm) payable to you as a result of your long-term employment with State Farm.

I have included several Exhibits in this report reflecting 2022 & 2023 letters from State Farm to Dwight Hill estimating the monthly benefit payable to Dwight Hill depending upon his possible retirement date. These monthly benefits have been estimated to be $5,500-$5,700 per month which could be payable for Mr. Hill's lifetime after his retirement from State Farm assuming he meets the necessary requirements of not competing against State Farm, and other typical obligations, etc. during his retirement years.

The facts in your case appear to be as follows:

1. Mr. Hill commenced work with State Farm on 8-1-1988.
2. Dwight Hill and Maribel Hill were married 10-19-2001
3. Mr. Hill is still working for State Farm as of 6-17-24
4. Dwight Hill and Maribel Hill are seeking a divorce as of 6-17-24.

These State Farm Termination agreements deal with deferred wages; and there has at least been one Texas family law court case dealing with State Farm Termination payments. See *Wade* 923 S.W. 2d 735 (Texarkana 1996).

**EXHIBIT**

**P-21**

exhibitsticker.com

Joseph W. McKnight commented in the 1997 SMU law review as follows-

"The agent's commissions were largely attributable to the renewal of policies previously sold by the agent and were thus clearly a form of deferred compensation...The appellate court remanded the case for a determination of a possible premarital separate property interest in the deferred compensation as well as an evaluation of the wife's interest in all the contractual benefits at the time of the divorce: the amount of benefits the earning spouse would receive on the date of divorce if he...were eligible for the benefits on that date under *Berry v Berry*. The court observed that once findings are made regarding the total number of years of benefits accrued, their proportional character, as separate and community property, and their value, there would be no further conditions unsatisfied under the *Berry* formula and no need to make an order for division of the benefits if and when received by the husband."

In formulating my opinion as to the characterization of these benefits payable to Dwight Hill or Maribel Hill; I have made the following fractional determinations using the *Berry* formula-

Number of months prior to marriage and in the plan-8-1-1988 to 10-1-2001; 158 months

Number of months in the plan 8-1-1988 to 6-17-24; 430 months

Separate Property component as of 6-17-24; 158 months/430 months = 36.74%

Community Property component as of 6-17-24; 272 months/430 months = 63.26%

Assuming a divorce on 6-17-24;

Dwight Hill would be entitled to 68.37% of the future monthly State Farm termination benefits.

Maribel Hill would be entitled to 31.63% of the future monthly State Farm termination benefits.

Please do not hesitate to contact me if you have any further questions.

Sincerely,

Stephen A. Fuqua, CPA, CVA

DLH.SF-003099

 

SEPTEMBER 30, 2022

**Personal and Confidential**

Dwight Hill Insurance Agency, Inc.
10300 N Central Expy Ste 296
Dallas, TX 75231-8663

Dear Dwight Hill:

This letter is in response to your request for information about your Agent's Agreement of the Dwight Hill Insurance Agency, Inc.

The Dwight Hill Insurance Agency, Inc. has no proprietary interest in the business generated under the Agent's Agreement (AA04 INC) with State Farm Mutual Automobile Insurance Company, State Farm Life Insurance Company, State Farm Fire and Casualty Company, and State Farm General Insurance Company (collectively referred to herein after as "State Farm"). The policies credited to the Dwight Hill Insurance Agency, Inc. account belong to State Farm and may be reassigned by State Farm to the accounts of other State Farm agents when the Agent's Agreement terminates. The policyholder records and the right to use those records to solicit renewals - commonly referred to as the "expirations" - belong to State Farm. Compensation or payments due or to become due under the Agreement may, however, be assigned with the written consent of the Companies and, of course, by operation of law.

The Dwight Hill Insurance Agency, Inc.'s monetary interests in the business are governed by Section II, Section IV and Section V of the State Farm Agent's Agreement.

Under Section II, the Dwight Hill Insurance Agency, Inc. is compensated pursuant to the Schedules of Payment for soliciting new business and for servicing existing business. Service compensation is paid for providing personal service to State Farm policyholders, cooperating with and assisting adjusters in reporting and handling claims, and cooperating with and advancing the interests of the Company. Service compensation is earned on a day-to-day basis.

Under Section IV, the Dwight Hill Insurance Agency, Inc. has a contract right to termination payments if you comply with certain conditions at the time the Agreement is terminated. Termination payments are based on the service compensation paid to the agent in the twelve-month period preceding the termination of the Agreement. Termination payments are paid in sixty monthly installments beginning in the month next following the termination of the Agreement.

**DLH.SF-002872**
**DLH.SF-003101**

Under Section V, agents 60 years of age or older who terminate with 20 years or more of service are eligible for extended termination payments. Extended termination payments, like termination payments, are based on the service compensation paid in the twelve-month period preceding the termination of the Agreement. Extended termination payments begin in the 61st month following the termination of the Agreement and continue for the lifetime of the agent.

A State Farm agent cannot sell, assign or pledge the Dwight Hill Insurance Agency, Inc. Agent's Agreement or any interest under it. Compensation or payments due or to become due under the Agreement may, however, be assigned with the written consent of the Companies and, of course, by operation of law.

Sincerely,

Kristal King

Agency Administration Leader
Agency/Sales Administration

DLH.SF-002873
DLH.SF-003102

# STATE FARM AGENT'S AGREEMENT

State Farm Mutual Automobile Insurance Company, State Farm Life Insurance Company, State Farm Fire and Casualty Company, and State Farm General Insurance Company, collectively referred to in this Agreement as "State Farm," or "the Companies," insurance corporations organized and existing under the laws of the State of Illinois, with their principal offices located at Bloomington, Illinois, and State Farm County Mutual Insurance Company of Texas, an insurance corporation organized and existing under the laws of the State of Texas with its principal office located at Dallas, Texas, appoint DWIGHT HILL INSURANCE AGENCY, INC., a corporation organized and existing under the laws of the State of Texas, with its office located at , Texas referred to in this Agreement as "the Agent," to represent the Companies in Texas, while properly licensed so to act, in accordance with the provisions of this Agreement. The chief executive officer of the Agent shall be the President. Schedule of Payments Forms AS4, CMS2, FS3, GS2, HS5, LLS1, LS5a, and LS8 applicable to the respective company as indicated, hereto attached, constitute a part of this Agreement. This Agreement is to become effective August 1, 2002, and shall continue until terminated as herein provided.

## PREAMBLE

The purpose of this Agreement is to reduce to writing the objectives, obligations, and responsibilities essential to the relationship between the Corporate Agent, its officers and employees, and State Farm. It is to our mutual interest to satisfactorily serve the insuring public, to comply with all applicable laws, to increase business commensurate with the available potential, and to maintain the Companies' operations on a profitable basis in order to assure the necessary financial strength to protect the policyholders' interest.

Insurance is a closely regulated business. The Companies and the agents must deal equitably with policyholders as to rates and claims, be trustworthy in handling money, avoid false advertising and unfair practices, and refrain from any action that would result in violation, by State Farm or any agent, of any applicable law or regulation.

The Companies do not seek and will not assert control over the Agent's officers or licensed sales representatives, but expect them to exercise their own judgment as to the time, place, and manner of soliciting insurance, servicing policyholders, and otherwise carrying out the provisions of this Agreement.

State Farm will make available to the Agent the experience and technical knowledge acquired and developed over the years in respect with selling, underwriting, and servicing insurance. The Companies will designate specific employees of the Companies to guide and advise the Agent's officers and licensed sales representatives. The Agent's officers and licensed sales representatives will also be invited to attend meetings conducted by the Companies for the purpose of introducing new products, ideas, services and procedures, promoting sales, and provide assistance, guidance, and consultation to better enable the Agent to carry out the provisions of this Agreement.

The Companies and the Agent expect that by entering into this Agreement, and by the full and faithful observance and performance of the obligations and responsibilities herein set forth, a mutually satisfactory relationship will be established and maintained.

To these ends, the Companies, the Agent and the President agree that:

## SECTION I - MUTUAL CONDITIONS AND DUTIES

A.  The Agent will solicit applications for insurance, collect initial premiums, membership fees and charges, countersign and deliver policies, reinstate and transfer insurance, assist policyholders and cooperate with adjusters in reporting and handling claims, avoid conflicts of interest, and cooperate with and advance the interests of the Companies, their agents, and the policyholders.

B.  The Officers and licensed sales representatives of the Agent have full control over their daily activities, with the right to exercise independent judgment as to time, place, and manner of soliciting insurance, servicing policyholders, and otherwise carrying out the provisions of this Agreement.

DLH-000505

C. State Farm will furnish the Agent, without charge, manuals, forms, records, and such other materials and supplies as the Companies may deem advisable to provide. All such property furnished by the Companies shall remain the property of the Companies. In addition, the Companies will offer at the Agent's expense such additional materials and supplies as the Companies feel may be helpful to the Agent.

D. Information regarding names, addresses, and ages of policyholders of the Companies; the description and location of insured property; and expiration or renewal dates of State Farm policies acquired or coming into the Agent's possession during the effective period of this Agreement, or any prior agreement, except information and records of policyholders insured by the Companies pursuant to any governmental or insurance industry plan or facility, are trade secrets wholly owned by the Companies. All forms and other materials, whether furnished by State Farm or purchased by the Agent, upon which this information is recorded shall be the sole and exclusive property of the Companies.

E. The expense of any office, including rental, furniture, and equipment; signs; supplies not furnished by the Companies; the salaries of the Agent's employees; telegraph; telephone; postage; advertising; and all other charges or expense incurred by the Agent in the performance of this Agreement shall be incurred by the Agent at the Agent's discretion and paid by the Agent. We anticipate that in the location or relocation of the Agent's office there will be no undue infringement on the established office location of any other agent. The Agent will not establish any office in addition to the Agent's principal office without the prior written approval of the Companies.

F. The Companies will advertise, provide promotional materials, and participate in the cost of the Agent's advertisements in accordance with policies determined from time to time by the Companies. The Agent will not use any advertisements referring to or identifying the Companies in any way without the prior written approval of the Companies.

G. The Agent shall provide at least one licensed sales representative whose principal occupation will be the fulfillment of the Agent's obligations established by this Agreement. The fulfillment of the Agreement shall be the Agent's principal business and neither the Agent nor any licensed sales representative employed by the Agent will directly or indirectly write or service insurance for any other Company, other than a State Farm subsidiary or affiliate or through any governmental or insurance industry plan or facility, or for any agent or broker, except in accordance with the terms of any written consent the Companies may give the Agent.

H. The Companies will leave in the Agent's account all automobile policies credited thereto so long as the policyholder resides within a 25-mile radius of the Agent's principal place of business and within a state in which the Agent is duly licensed, except that the Companies may, after prior written notice to the Agent, transfer any automobile policy to the account of another State Farm agent when the policyholder makes a bona fide request in writing. The Agent will respect the rights and interests of other agents in policies credited to their accounts by refraining from raiding or otherwise diverting policies from their accounts to the Agent's account.

I. All moneys collected on behalf of the Companies shall be held in trust by the Agent as the absolute property of the Companies, and the Agent will be responsible for these moneys until they are safely transmitted to the Companies. The Agent agrees to maintain in a bank or similar financial institution, a premium fund account, which the Companies may audit at any time, in which the Agent will promptly deposit all cash collected for premiums, membership fees, and charges. The Agent further agrees to transmit promptly to the Companies the moneys so deposited, through checks drawn upon this premium fund account, along with all insurance applications received and all checks collected on behalf of the Companies.

J. Any amount (exclusive of premiums due on policies issued to the Agent and the President) at any time owing by the Agent to any of the Companies, their subsidiaries and affiliates, shall be a first lien on any payment due or thereafter becoming due the Agent under any of the provisions of this Agreement, and the Companies are authorized to deduct such indebtedness from any such payment due or thereafter becoming due to the Agent from any of the Companies.

K. If any application is rejected or any policy is surrendered or cancelled, in whole or in part, for any reason, before the expiration of the policy period, or if any premium is reduced or any overpayment made to the Agent, the compensation paid to the Agent on the amount returned or credited to the policyholder or the amount overpaid to the Agent shall be charged to the Agent and shall constitute an indebtedness of the Agent to the Companies.

L. The Companies retain the right to prescribe all policy forms and provisions; premiums, fees, and charges for insurance; and rules governing the binding, acceptance, renewal, rejection, or cancellation of risks, and adjustment and payment of losses.

M. The Agent will not represent itself as having any powers except those authorized by this Agreement, and subject to any applicable law. Without limiting the foregoing, the Agent shall not have authority to extend the time of payment of any premium, or to alter, waive, or forfeit any of the Companies' rights, requirements, or conditions in any policy of insurance, or otherwise obligate the Companies in any way except as stated in this Agreement or expressly authorized under the rules and regulations of

DLH-000506

the Companies or as otherwise authorized in writing by the Companies.

## SECTION II - COMPENSATION

A. Each Company will make payments to the Agent as set forth in the applicable Schedule of Payments.

B. As additional compensation, State Farm will maintain insurance upon the life of the President, payable to the beneficiary selected by the Agent, so long as this Agreement has not been terminated and the President has not attained age 65; provided, however, that in no event will such insurance be maintained in force during a period commencing thirty-one days after the President has begun active duty as a member of the military, naval, or air forces of any country or international organization and ending with termination of such duty. The amount of insurance during any calendar year shall be equal to the Agent's gross compensation received from the Companies in the preceding calendar year, exclusive of compensation based on policies issued by the Companies pursuant to any governmental or insurance industry plan, pool or facility, or $10,000, whichever is the greater, but in no event shall such insurance be more than $50,000.

C. Each Company reserves the right to fix and determine the amount, extent, and conditions of any bonuses, awards, prizes, and allowances.

## SECTION III - TERMINATION OF AGREEMENT

A. The Agent or State Farm have the right to terminate this Agreement by written notice delivered to the other or mailed to the other's last known address. The date of termination shall be the date specified in the notice, but in the event no date is specified, the date of termination shall be the date of delivery if the notice is mailed. Either party can accelerate the date of the termination specified by the other by giving written notice of termination in accordance with this paragraph.

B. After termination of this Agreement, the Agent agrees not to act or represent itself in any way as an agent or representative of the Companies.

C. Within ten days after the termination of this Agreement, all property belonging to the Companies shall be returned or made available for return to the Companies or their authorized representative.

D. For a period of one year following termination of this Agreement, neither the Agent, the President, nor any of the licensed sales representatives, will either personally or through any other person, agency, or organization (a) induce or advise any State Farm policyholder credited to the Agent's account at the date of termination to lapse, surrender, or cancel any State Farm insurance coverage or (b) solicit any such policyholder to purchase any

insurance coverage competitive with the insurance coverages sold by the Companies. In the event the "period of one year" conflicts with any statutory provision, such period shall be the period permitted by statute.

## SECTION IV - TERMINATION PAYMENTS

A. In the event this Agreement is terminated, the respective Companies will, subject to the conditions set forth in subparagraph A-5 and paragraph B of this section, pay the Agent, less any deductions for commission charge backs, the following termination payments:

1. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY will pay:

   (a) For the first twelve (12) months following the date of termination the lesser of the amounts computed in (1) and (2):

   (1) twenty percent (20%) of the service compensation on "personally produced" policies by the licensed sales representative(s) designated by the Agent pursuant to Section VI.A(3), earned under the Schedule of Payments For Other Than Health Insurance Policies in the twelve (12) preceding months, or twenty percent (20%) of the service compensation on "personally produced" policies credited to the Agent's account, as of the date of termination, which remain in force in the same state during the first twelve (12) months following the date of termination, whichever is greater, or

   (2) thirty percent (30%) of the service compensation on "personally produced" policies credited to the Agent's account as of the date of termination, which remain in force in the same state during the first twelve (12) months following the date of termination.

   In the event thirty percent (30%) of the service compensation as specified in (2) is less than the greater amount of the service compensation as computed in (1) and if the number of such "personally produced" policies in force at the end of the first twelve (12) months following the date of termination is equal to or greater than seventy-five percent (75%) of the number of the "personally produced" policies in force at date of termination, the Agent will be paid the amount provided for in (1).

   (b) For the first twelve (12) months following the date of termination the lesser of the amounts computed in (1) and (2):

2-RR463

DLH-000507

(1) twenty percent (20%) of the service compensation the Agent earned on health insurance policies under the Schedule of Payments For Health Insurance Policies in the twelve (12) preceding months, or twenty percent (20%) of the service compensation on health insurance policies credited to the Agent's account at date of termination which remain in the same state and in force during the first twelve months following the date of termination, except those policies which became available in the same state for assignment to an agent as a result of the termination of an agreement between the Company and an agent, or as a result of an agreement between an agent and the Companies pursuant to the applicable paragraph of Section IV of a State Farm Agent's Agreement, on which one year has not elapsed since date of termination; whichever is greater, or

(2) two percent (2%) of the second and subsequent policy years net premium collections received and recorded in the twelve (12) months following date of termination on health insurance policies which remain in the same state, credited to the Agent's account as of the date of termination, except those policies which became available in the same state for assignment to an agent as a result of the termination of an agreement between the Company and an agent, or as a result of an agreement between an agent and the Companies pursuant to the applicable paragraph of Section IV of a State Farm Agent's Agreement, on which one year has not elapsed since date of termination.

In the event two percent (2%) of the net premium collections as specified in (2) is less than the greater amount of the service compensation as computed in (1) and if the number of policies in force at the end of the first twelve (12) months following the date of termination is equal to or greater than seventy-five percent (75%) of the number of policies in force at date of termination, the Agent will be paid the amount computed in (1).

(c) The payments provided for in (a) and (b) shall be made in estimated monthly installments equal to twenty percent (20%) of the service compensation earned in the twelfth (12th) preceding month subject to appropriate adjustments following a determination of the net premium collections as specified in (a)(2) and (b)(2) and the number of policies in force, where applicable.

(d) For each of the succeeding forty-eight (48) months the Agent will be paid an amount equal to one-twelfth (1/12th) of the total amount payable in the first twelve (12) months after termination.

2. STATE FARM FIRE AND CASUALTY COMPANY, STATE FARM GENERAL INSURANCE COMPANY and STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS each will pay:

(a) For the first twelve (12) months following date of termination the lesser of the amounts computed in (1) and (2):

(1) twenty percent (20%) of the commissions the Agent was paid on "personally produced" policies by the licensed sales representative(s) designated by the Agent pursuant to Section VI.A(3), for those lines of insurance classified by the Companies in paragraphs 1-A, B and C of the applicable Schedule of Payments, in the twelve (12) preceding months, or twenty percent (20%) of the commissions on such "personally produced" renewal premiums, which would have been paid under the applicable Schedule of Payments, if this Agreement had not been terminated, in the twelve (12) months following the date of termination on such "personally produced" policies, which remain in the same state, for those lines of insurance designated above and credited to the Agent's account as of the date of termination; whichever is greater, or

(2) thirty percent (30%) of the commissions on such "personally produced" renewal premiums which would have been paid under the applicable Schedule of Payments, if this Agreement had not been terminated, in the twelve (12) months following the date of termination on those "personally produced" policies designated in (1) and credited to the Agent's account as of the date of termination.

In the event thirty percent (30%) of the commissions as computed in (2) is less than the greater amount computed in (1) and if the number of such designated "personally produced" policies in force at the end of the first twelve (12) months following date of termination is equal to or greater than seventy-five percent (75%) of the number of such designated "personally produced" policies in force at date of termination, the Agent will be paid the amount provided for in (1).

DLH-000508

(b) The payments provided for in (a) shall be made in estimated monthly installments equal to twenty percent (20%) of the commissions paid on the designated "personally produced" policies in the twelfth (12th) preceding month subject to appropriate adjustments following a determination of the commissions specified in (a)(2) and the number of such "personally produced" policies in force, where applicable.

(c) For each of the succeeding forty-eight (48) months the Agent will be paid an amount equal to one-twelfth (1/12th) of the total amount payable in the first twelve (12) months after termination.

3. STATE FARM LIFE INSURANCE COMPANY will pay on business written before January 1, 1982:

(a) An amount equal to the same compensation, for the second and subsequent policy years as would have been due and payable to the Agent for the first five years following the date of termination on all State Farm life policies personally written by the licensed sales representative designated by the Agent pursuant to Section VI.A(3), or assigned to the Agent by the Company for compensation, under the terms of the applicable Schedule of Payments attached hereto, if this Agreement had not been terminated.

(b) The payments provided for in (a) shall be made in monthly installments for each of the sixty (60) months which would have been due and payable to the Agent for that month if this Agreement had not been terminated.

4. STATE FARM LIFE INSURANCE COMPANY will pay on business written during the existence of this Agreement and on or after January 1, 1982:

(a) On life policies personally written by the licensed sales representative designated by the Agent pursuant to Section VI.A(3), an amount equal to the writing compensation, for the second and subsequent policy years as would have been due and payable to the Agent under the terms of the applicable Schedule of Payments attached hereto if the Agreement had not been terminated.

(b) On life policies in the Agent's account on which two percent (2%) servicing compensation is being paid to the Agent at the time of termination of this Agreement, an amount equal to one and one-half percent (1 1/2%) of one-twelfth (1/12) of the annualized premium of the policies shall be paid in monthly installments for each of the sixty (60) months after termination of this Agreement.

(c) On Flexible Premium Retirement policies in the Agent's account on which the Agent is eligible for servicing compensation at the time of termination of this Agreement, an amount equal to three-fourths of one percent (3/4 of 1%) of an average monthly premium of the policies shall be paid in monthly installments for each of the sixty (60) months after termination of this Agreement, except that no amount shall be paid on those policies made available for assignment by the termination of an agreement between the Company and an agent or by a release of policies pursuant to the applicable paragraph of Section IV of a State Farm Agent's Agreement. The average monthly premium of a policy shall be calculated by dividing the total premium paid on the policy by the number of full months elapsing between its Policy Date and termination of this Agreement.

5. GOVERNMENTAL OR INSURANCE INDUSTRY PLAN OR FACILITY. All policies, premium collections and compensation the Agent receives thereon, issued by the Companies pursuant to any governmental or insurance industry plan or facility, shall be excluded from the calculations and provisions for termination payments.

6. CESSATION OF BUSINESS. In the event the respective Company discontinues doing business in the state in which the agent is licensed as a representative of the Company, that Company agrees to pay the agent the following payments in lieu of the termination payments provided for in this section and Section V of this Agreement, subject to the mutual conditions herein set forth:

(a) For the first twelve (12) months following the date of termination STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY will pay the amount computed in A-1 based on your earnings under the applicable Schedule of Payments in the twelve (12) preceding months as provided for in A-1-(a)(1) and A-1-(b)(1).

(b) For the first twelve (12) months following the date of termination STATE FARM FIRE AND CASUALTY COMPANY, STATE FARM GENERAL INSURANCE COMPANY, and STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS will pay the amount computed in A-2 based on the commissions you were paid under the applicable Schedule of Payments in the twelve (12) preceding months as provided for in A-2-(a)(1).

(c) For each of the succeeding forty-eight (48) months you will be paid by that Company an amount equal to one-twelfth (1/12th) of the amount payable in the first twelve (12) months after termination.

DLM-000602

(d) The foregoing payments are to be made only on your written acceptance of a termination date to be determined by the applicable Company.

(e) In the event of your written acceptance as provided for in (d) the applicable Company agrees to transfer to you all its rights and ownership in the property set forth in paragraph D of Section 1 of this Agreement.

B. Payments under paragraph A above shall be as follows:

1. If within ten (10) days following the date of termination, all property belonging to the respective Companies has been returned or made available for return to that Company or its authorized representative the Agent shall qualify for the first two (2) monthly installments from that Company as provided in paragraph A.

2. If the Agent has qualified for payments by the respective Companies under subparagraph B-1, and so long as the Agent, the President, and the licensed sales representative, have not, for a period of twelve (12) months following termination of this Agreement, either personally or through any other person, agency or organization, solicited or sold, either at renewal time or otherwise, to that Company's policyholders, which were credited to the Agent's account at the time of termination, any insurance coverage competitive with the insurance coverages sold by that Company, the Agent shall qualify for the remaining monthly installments from that Company as provided in paragraph A.

C. In the event the Agent and the Company enter into a written agreement, without the complete termination of this Agreement, to release at one time from the Agent's account for reassignment to other agents, at least twenty-five percent (25%) or five hundred (500), whichever number is less, of the automobile insurance policies credited to the Agent's account, and in addition all other State Farm policies held by policy-holders and members of the households of such policyholders whose automobile insurance policies are reassigned, the Companies with respect to the policies so released, will pay the Agent the termination payments in accordance with the provisions of paragraphs A and B, as those provisions may be applicable to each of the Companies.

### SECTION V - EXTENDED TERMINATION PAYMENTS

A. In the event the Agreement is terminated, and the Agent qualified for the termination payments set forth in Section IV-B-1 and 2, and at the time of termination of this Agreement:

(1) the President of the Agent is 62 years of age or older; and

(2) the President was a licensed agent for the Companies, or a licensed sales representative of the Agent, for a combined period of twenty (20) years or more, either under this Agreement or accumulatively under any prior State Farm Agent's Agreement (Form AA) or Local Agent's Appointment (Form LA); and

(3) the President had ten (10) years of combined continuous service as a licensed agent for the Companies, or a licensed sales representative of the Agent, immediately preceding the date this Agreement is terminated;

the respective Companies will pay the Agent monthly payments beginning on the last day of the 61st month following termination and continuing until the last day of the month in which the death of the President occurs, either

- if the President is 65 years of age or older at termination of this Agreement, an amount equal to the following,

or

- if the President is 62, 63, or 64 years of age at termination of this Agreement, a lesser amount based on the following adjusted by an actuarial equivalent factor based upon the President's age at termination of this Agreement:

1. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY will pay an amount equal to the monthly payment by this Company as provided for in subparagraph A-1-(a) of Section IV.

2. STATE FARM FIRE AND CASUALTY COMPANY, STATE FARM GENERAL INSURANCE COMPANY and STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS will pay amounts equal to the following:

(a) That portion of the monthly payments by these Companies as provided for in subparagraph A-2 of Section IV based on "personal lines of insurance" so classified by the Companies in the applicable Schedule of Payments; and

(b) 50% of that portion of the monthly payments by these Companies as provided for in subparagraph A-2 of Section IV based on the "commercial lines of insurance" so classified by the Companies in the applicable Schedule of Payments. Provided, however, that these payments on such "commercial lines of insurance" shall be calculated on only the first $5,000.00 of net premium collections received by the Companies on any one risk or policy.

DLH-000510

3. **STATE FARM LIFE INSURANCE COMPANY** will pay an amount equal to the monthly payment by this Company as provided for in subparagraphs A-4-(b) and (c) of Section IV.

## SECTION VI - GENERAL PROVISIONS

A. This Agreement has been entered into by the Companies with the Agent in reliance upon the representations and agreements that:

(1) The following person(s) substantially participate(s) in the ownership of the Agent:

| NAME | ADDRESS | PERCENTAGE OF INTEREST |
|------|---------|------------------------|
| Dwight L. Hill | 10222 Midway Rd. Dallas, TX 75229-6231 | 100 |

(2) The President of the Agent, having full managerial authority and responsibility for the operating management of the Agent as provided for by its by-laws, shall be a person acceptable to the Companies. The Agent will advise the Companies, in writing, at least forty-five (45) days prior to the appointment of such President of the identities and qualifications of all candidates being considered for appointment as President. The Companies will be deemed to have approved those candidates with respect to which they have not notified the Agent of their unacceptability within thirty (30) days after receipt of the Agent's advice that the candidates are being considered for appointment.

(3) The person or persons designated by the Agent as licensed sales representative(s) of the Agent shall be acceptable to the Companies. The Agent will advise the Companies, in writing, at least forty-five (45) days prior to appointment of a licensed sales representative of the identities and qualifications of all candidates being considered for appointment as licensed sales representative(s). Unless the Companies, within thirty (30) days after receipt of such advice, notify the Agent that a candidate is unacceptable to the Companies, the Companies will be deemed to have approved such candidates.

All notices of the identities and qualifications of candidates for the position of President or licensed sales representative shall be sent to a Regional Vice President or Agency Vice President.

B. Since each party is relying upon the other or others to carry out the provisions of this Agreement, neither the Agreement nor any interest thereunder can be sold, assigned, or pledged; and no right in any sum due or to become due to the Agent hereunder can be sold, assigned, or pledged without the prior written consent of the Companies.

C. Each Company shall be bound by all the terms of this Agreement, except that the separate Schedule of Payments hereto attached, and those other provisions where the express language or context indicates that they are applicable to the individual Companies only; and the rights and duties of the Agent with respect to each Company shall be governed accordingly.

D. The President in his individual capacity shall be bound only by the terms of this Agreement that specifically refer to the President.

E. All payments for termination which otherwise might have become available to the Agent under the terms of prior agreements with any of the Companies are hereby waived by the Agent.

F. This Agreement shall supersede all prior agreements between the parties hereto, written or otherwise, and it shall constitute the sole and entire Agreement between the parties, and no change, alteration, or modification of the terms of this Agreement may be made except by agreement in writing signed by a Regional Vice President or an Agency Vice President of the Companies and accepted by the Agent.

2 RR 467

DLH-000511

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in triplicate on their behalfs.

WITNESS:

DWIGHT HILL INSURANCE AGENCY, INC.

By: _____
President

_____
Dwight L. Hill, Individually

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY
STATE FARM LIFE INSURANCE COMPANY
STATE FARM FIRE AND CASUALTY COMPANY
STATE FARM GENERAL INSURANCE COMPANY
STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS

By: _____
Authorized Representative
Vice President of Agency

KRISTI ROTH

AUG 0 5 2002

(Rev. 1/1/82)

Printed in U.S.A.

Form AGT-AWS-1

# AGENTS' WORK STATION LOAN AGREEMENT

This is a Loan Agreement (the "Agreement") between State Farm Mutual Automobile Insurance Company, its subsidiaries and affiliates ("STATE FARM"), having its principal place of business at One State Farm Plaza, Bloomington, Illinois 61710, and ___Dwight L Hill___ . _____ (hereinafter referred to as "AGENT"), of ___Irving, Texas_____

## WITNESSETH

WHEREAS, STATE FARM desires to loan to AGENT, and AGENT desires to borrow from STATE FARM certain equipment and software;

NOW THEREFORE, in consideration of the mutual promises herein set forth, the parties hereto agree as follows:

1. Equipment. STATE FARM agrees to loan to AGENT and AGENT agrees to borrow from STATE FARM the items of equipment (collectively, the "Equipment") listed on Exhibit A attached hereto and incorporated herein. The parties agree that the Equipment becomes part of the ECHO system in AGENT's possession under the ECHO System Agreement.

2. Software. STATE FARM agrees to loan to AGENT and AGENT agrees to borrow from STATE FARM the software (collectively, the "Software") listed on Exhibit A attached hereto and incorporated herein. AGENT acknowledges that the Software is licensed for use under separate agreements between STATE FARM and software vendors, and that the Software and all documentation and copies thereof are proprietary to the software vendors. AGENT agrees not to sell, distribute or loan it to any other entity, and shall not decompile, reverse engineer or make copies of the Software, but that it may make copies for backup or archival purposes. The parties agree that the Software and any updates or upgrades provided under Section 5 below become part of the ECHO system in AGENT's possession under the ECHO System Agreement.

3. Term. The Equipment and Software shall be loaned for a period beginning with its installation, and shall continue until terminated on thirty (30) days' written notice to the other. This Agreement shall also terminate immediately without further action of either party upon termination of the State Farm Agent's Agreement. In the event of termination, AGENT agrees to that the Equipment and Software together with any documentation and updates shall be made available for STATE FARM to retrieve, and to use reasonable means for the safekeeping of the Equipment of Software until such time that STATE FARM may remove the Equipment or Software from AGENT's office.

4. Maintenance and Support. STATE FARM agrees to provide maintenance and support for the Equipment and Software. AGENT acknowledges that some or all of the maintenance and support will be provided through the manufacturer's original warranty or through contracted services. AGENT agrees promptly to report to STATE FARM any defects or malfunctions of the Equipment or Software to enable STATE FARM to provide such support and make requests for correction under appropriate warranties. AGENT further agrees to cooperate in providing access to its premises necessary to conduct maintenance and support.

AGENT agrees that, this maintenance and support obligation notwithstanding, AGENT shall be responsible for any maintenance cost for (a) problems caused by AGENT's failure to maintain a suitable installation environment for the Equipment or Software; (b) problems caused by misuse or abuse of Equipment or Software, or by use of non-STATE FARM approved supplies or by misuse of supplies; and (c) problems caused by unauthorized repair or tampering with the Equipment or Software.

5. Updates or Upgrades. STATE FARM agrees to provide AGENT Software and Equipment updates or upgrades as determined by STATE FARM. Any such updates or upgrades shall be considered included in the terms "Software" or "Equipment" as defined above.

DLH-000557

6. Restrictions on Use. AGENT agrees to use the Equipment and Software only in its business as an independent contractor agent or trainee agent for STATE FARM. Unless authorized in writing by STATE FARM, AGENT further agrees that it will not (i) load any software onto the Equipment, (ii) add any equipment onto the system which equipment or software is not listed in Exhibit A or subsequently supplied for AGENT's use by STATE FARM, or (iii) use the Equipment or Software to access the Internet (other than accessing the STATE FARM home page) or any other on-line services. In the event of any violation of this Section, AGENT agrees to compensate STATE FARM for any repair or restoration of the Equipment or Software which STATE FARM at its option elects to perform or have performed.

7. Risk of Loss. STATE FARM assumes all risk of casualty loss to the Equipment and Software under this Agreement while in transit and while in your possession, except for loss caused by the grossly negligent, reckless or willful or intentional conduct of AGENT or AGENT's office staff. STATE FARM shall not be responsible for any loss caused by loss of use of the Equipment or Software including but not limited to lost profits. AGENT will be responsible for obtaining insurance, if it so desires, to cover AGENT's loss of use of the Equipment or Software.

8. Personal Property Taxes. STATE FARM leases, owns or licenses the Equipment and Software under this Agreement. As the lessee, owner or licensee of the Equipment and Software, STATE FARM is responsible for the payment of those personal property taxes attributable to such Equipment and Software which are legally assessed against STATE FARM or its property.

9. DISCLAIMER OF WARRANTIES. OTHER THAN THOSE STATED HEREIN, STATE FARM MAKES NO WARRANTY EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION, THE DESIGN OR CONDITION OF THE EQUIPMENT OR SOFTWARE, ITS MERCHANTABILITY OR ITS FITNESS OR CAPACITY OR DURABILITY FOR ANY PARTICULAR PURPOSE, THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE EQUIPMENT OR SOFTWARE OR CONFORMITY OF THE EQUIPMENT OR SOFTWARE TO THE PROVISIONS AND SPECIFICATIONS OF ANY PURCHASE ORDER OR ORDERS RELATING THERETO. AS TO STATE FARM, AGENT BORROWS THE EQUIPMENT AND SOFTWARE "AS IS."

10. LIMITATION OF LIABILITY AND HOLD HARMLESS. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, STATE FARM SHALL NOT BE LIABLE FOR ANY LOSS OR DAMAGE CLAIMED TO HAVE RESULTED FROM THE USE OF THE EQUIPMENT AND SOFTWARE OR TO BE RELATED IN ANY WAY TO THE TRANSACTION TO WHICH THIS AGREEMENT RELATES, REGARDLESS OF THE FORM OF ACTION, EXCEPT FOR LOSS OR DAMAGE RESULTING FROM THE NEGLIGENCE OF STATE FARM. AGENT AGREES THAT IT SHALL INDEMNIFY AND HOLD STATE FARM HARMLESS FOR ANY LIABILITY, LOSS, CLAIM COST OR EXPENSES OF ANY KIND WHATSOEVER, INCLUDING COSTS AND REASONABLE ATTORNEYS' FEES, ARISING FROM ANY SUCH CLAIM, OR DAMAGE TO PERSONS OR PROPERTY ARISING OUT OF THE FAULT OR NEGLIGENCE OF AGENT, ITS EMPLOYEES OR AGENTS. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, ANYTHING IN THE AGREEMENT TO THE CONTRARY NOTWITHSTANDING, UNDER NO CIRCUMSTANCES WHATSOEVER SHALL STATE FARM BE LIABLE TO AGENT FOR ANY SPECIAL, CONSEQUENTIAL, INDIRECT, CIRCUMSTANTIAL, OR INCIDENTAL DAMAGES OR ANY KIND WHATSOEVER.

11. Assignment and Delegation. Anything in the Agreement to the contrary notwithstanding, AGENT may not delegate or assign its duties under the Agreement to any other entity, except when such delegation or assignment is approved in advance by State Farm in writing, which approval STATE FARM may in its sole discretion grant or deny.

This Agreement shall be a contract binding upon each of the parties hereto, their successors and assigns, represents the entire agreement between parties, and cannot be amended or modified except as agreed to by each of the parties in writing.

2 RR 514

IN WITNESS WHEREOF, AGENT and STATE FARM have caused this Agreement to be executed below. This Agreement shall become effective on the date the second of the two parties to sign executes this Agreement below.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

Date 6/1/97          By_____(signature)
                                Authorized Representative

Date 4/15/97        By_____(signature)
                                         Agent


_____Dwight L Hill_____(printed)
                         Agent

Replaces-None
12-16-96

Printed in U.S.A.

DLH-000668

••••••••••••

**EXHIBIT A**

**EQUIPMENT:**

IBM P750 desktop
    Pentium 133 MHZ processor
    32MB Memory
    1.62GB Hard drive
    Sound/FAX/modem card - IBM MWave
    Token Ring card - Olicom 3118
    DualStor 800 tape drive
    6x CD ROM drive
17" monitor
Keyboard
Mouse
Lan Based Modem (LBM)
ANTEC Multi Access Unit (MAU)
Tripp Lite surge protector

**SOFTWARE:**

IBM AntiVirus for Windows NT, 2.4
Windows NT 4.0 SUR
Quicken 6.0 USA
NT Service Register (AWS Iss)
ODBC Manager & Access Database for ODBC
SNA Net Config
Quickpay 3.0
Rumba NT, Version 1.0
SNA Workstation, Version 2.11
VSE Smalltalk runtime libraries
AWS Introduction CBE Parts 1-3
Path (IL only)
ASAT - Agent Staff Aptitude Test
Administrative Command Initiator
NetOp
Microsoft Internet Explorer 3.0
CPE Middleware Communication
Philibert Uniscreen II

Staff Administration
Introduction and Overview GN
Reference Sources
Using Desktop Classroom
Car Insurance Policies - Topic 1-5 GN
Premium Calculation
Pricing Principles GN
Eligibility and Binding Rules GN
Claims Principles
Claims Handling, Parts 1-2
The ECHO Auto Application
Miscellaneous Vehicles
Auto Policy Changes
Desktop Classroom
Desktop Classroom Tutorial
AWS End of Day
Icon Author



April 07, 2023

Hill, Dwight L
4647 Elsby Ave
Dallas, TX 75209-3203

Dear Dwight,

Following is a review of your estimated Termination and Extended Termination Payments you requested. Section IV, Paragraph B of the Agent's Agreement reviews the qualifications that must be met in order for Termination Payments to be made. In order for Termination Payments to be made, the Agent's Agreement must be terminated. The agent will return, or make available for return, Company property within 10 days of the termination of the agreement. In addition, the agent agrees to not induce, advise, or solicit any State Farm policyholders in his account at the time of his termination. The agent also agrees to not act or represent himself in any way as an agent or representative of the Companies. Please see Section III, Termination of Agreement, of the Agent's Agreement for a more thorough review of Termination provisions.

The following are your estimated monthly Termination and Extended Termination Payments by company assuming a 2/28/2023 termination date. Term payments will be made for 60 months following your termination.

|  | Term Pay | Ext Term Pay |
| --- | --- | --- |
| Auto Voluntary | $2,118 | $2,118 |
| Auto TCM | $9 | $0 |
| Fire | $176 | $171 |
| Lloyds | $3,114 | $3,087 |
| Fire TCM | $116 | $116 |
| Health | $23 | $0 |
| Life* | $104 | $104 |
| **Total** | **$5,660** | **$5,596** |

**NOTE**: Extended Termination pay is available to agents who are 60 years or older with 20 years of service (last 10 continuous). Please remember that if you terminate prior to age 65, your Extended Termination Payments will be actuarially reduced. Extended termination payments are also available for those agents who meet the terms of the Early Notification Program. Under the Early Notification Program, you can qualify for Extended Termination payments at age 55 if (1) you are at least 55 years old, with 20 years of service (last 10 continuous) OR (2) age plus years of service equals 80.

**Extended Termination amounts will be actuarially reduced for retirement before age 65.** For retirement at age 58 years 4 months, the actuarial factor of 0.5685 reduces your Extended Termination payments to $3,181 a month. If you elect the joint and 2/3 survivor option, the extended term amount would be further adjusted to $2,726 a month. The survivor amount would be $1,817 a month.

**NOTE: Life Writing Compensation** Payments are based on writing compensation that would have been paid to you if your Agreement had not been terminated. **Life Writing Compensation** Payments will fluctuate each month depending on premium paid each month following termination and payments are reduced by a decreasing commission scale as business ages and any lapsed/cancelled policies.

**NOTE:** All figures are estimates. Contract provisions will govern actual amounts.

Attached is the estimate you requested. If you have any additional questions or concerns, please contact an ASR Representative at 1-877-889-2294 and follow the prompts to contracts and compensation.

Our hours of operation are 7am to 7 pm central time, Monday through Friday.

Sincerely,
Agency/Sales Resources

**DLH.SF-002871**
**DLH.SF-003100**



May 30, 2024

Hill, Dwight L
4647 Elsby Ave
Dallas, TX 75209-3203

Dear  Dwight,

Following is a review of your estimated Termination and Extended Termination Payments you requested.  Section IV, Paragraph B of the Agent's Agreement reviews the qualifications that must be met in order for Termination Payments to be made.  In order for Termination Payments to be made, the Agent's Agreement must be terminated.  The agent will return, or make available for return, Company property within 10 days of the termination of the agreement.  In addition, the agent agrees to not induce, advise, or solicit any State Farm policyholders in his account at the time of his termination.  The agent also agrees to not act or represent himself in any way as an agent or representative of the Companies.  Please see Section III, Termination of Agreement, of the Agent's Agreement for a more thorough review of Termination provisions.

The following are your estimated monthly Termination and Extended Termination Payments by company assuming a 4/30/2024 termination date.  Term payments will be made for 60 months following your termination.

|  | Term Pay | Ext Term Pay |
|---|---|---|
| Auto Voluntary | $2,645 | $2,645 |
| Auto TCM | $19 | $0 |
| Fire | $198 | $193 |
| Lloyds | $3,665 | $3,636 |
| Fire TCM | $125 | $125 |
| Health | $22 | $0 |
| Life | $102 | $102 |
| **Total** | **$6,776** | **$6,701** |

**NOTE**:  Extended Termination pay is available to agents who are 60 years or older with 20 years of service (last 10 continuous).  Please remember that if you terminate prior to age 65, your Extended Termination Payments will be actuarially reduced.  Extended termination payments are also available for those agents who meet the terms of the Early Notification Program.  Under the Early Notification Program, you can qualify for Extended Termination payments at age 55 if (1) you are at least 55 years old, with 20 years of service (last 10 continuous) OR (2) age plus years of service equals 80.

**Extended Termination amounts will be actuarially reduced for retirement before age 65.**  For retirement at age 59 years  6 months, the actuarial factor of 0.6222 reduces your Extended Termination payments to $4,169 a month.  If you elect the joint and 2/3 survivor option, the extended term amount would be further adjusted to $3,543 a month.  The survivor amount would be $2,362 a month.

**NOTE:  Life Writing Compensation** Payments are based on writing compensation that would have been paid to you if your Agreement had not been terminated.  **Life Writing Compensation** Payments will fluctuate each month depending on premium paid each month following termination and payments are reduced by a decreasing commission scale as business ages and any lapsed/cancelled policies.

**NOTE:**  All figures are estimates.  Contract provisions will govern actual amounts.

Attached is the estimate you requested. If you have any additional questions or concerns, please contact an ASR Representative at 1-833-335-0077 and follow the prompts to contracts and compensation.

Our hours of operation are 7am to 7 pm central time, Monday through Friday.

Sincerely,
Agency/Sales Resources



**EXHIBIT**

**P-22**

**DLH-009152**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Richard Orsinger
Bar No. 15322500
richard@ondafamilylaw.com
Envelope ID: 107747671
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Dwight L. Hill Appellee's Brief
Status as of 11/6/2025 12:43 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Robert Epstein | 24065206 | robert@epsteinpc.com | 11/6/2025 12:31:52 PM | SENT |
| Richard Osinger | | richard@ondafamilylaw.com | 11/6/2025 12:31:52 PM | SENT |
| Marisol Lopez | | marisol@lawyerforu.com | 11/6/2025 12:31:52 PM | SENT |
| Diane Wiles | | Diane@ondafamilylaw.com | 11/6/2025 12:31:52 PM | SENT |